# IN THE

# United States Court of Appeals
## FOR THE THIRD CIRCUIT

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

THOMAS MEGAS,

*Defendant-Appellant,*

and

TODD LAHR,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**SUPPLEMENTAL BRIEF AND APPENDIX VOLUME I OF
APPOINTED *AMICUS CURIAE* SUPPORTING APPELLANT**

J. Scott Ballenger
Ben Buell (Third Year Law Student)
Jonathan Duvall (Third Year Law Student)
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
Appellate Litigation Clinic
580 Massie Road
Charlottesville, VA 22903
202-701-4925
sballenger@law.virginia.edu

*Court Appointed Amicus Curiae Counsel Supporting Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...............................................................................................iv

STATEMENT OF JURISDICTION.....................................................................................1

STATEMENT OF THE ISSUES...........................................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

INTRODUCTION ...................................................................................................................2

STATEMENT OF THE CASE...............................................................................................5

    Legal Background .............................................................................................................5

    Facts and Proceedings Below .........................................................................................10

       I.      The SEC's Initial Knowledge Of Megas's Address.................................10

       II.    The SEC Fails To Serve Megas Under The Hague Convention..............11

       III.   The SEC Purports To Serve Megas By Email .........................................14

       IV.   Megas Contests The Default Judgment.....................................................15

       V.    The District Court Denies Megas's Motion ..............................................16

STANDARD OF REVIEW ....................................................................................................18

SUMMARY OF ARGUMENT ..............................................................................................18

ARGUMENT ...........................................................................................................................22

       I.      MEGAS'S ADDRESS WAS KNOWN AND THEREFORE THE
            HAGUE CONVENTION APPLIES .......................................................22

A.  Mr. Megas's Address Was Known By The Commission Early In This Litigation, And Its Validity Has Been Repeatedly Confirmed ........................................................22

B.  The Structure Of The Convention Precludes The SEC's Expansive Interpretation Of When An Address Is "Not Known" ...................................................................26

II.  SERVICE BY EMAIL AND DEFAULT JUDGMENT WERE "PROHIBITED BY INTERNATIONAL AGREEMENT" HERE, AND THEREFORE RULE 4(F)(3) WAS UNAVAILABLE .................29

A.  There Was No Valid Service Under The Hague Convention ..........29

B.  Article 15(2) Does Not Permit A Default Judgment Based On Email Service In These Circumstances ...............................................36

III.  THE DISTRICT COURT ERRED OR ABUSED ITS DISCRETION IN AUTHORIZING EMAIL SERVICE UNDER RULE 4(F)(3) ........................................................................40

IV.  SERVICE VIA MEGAS'S HOTMAIL ACCOUNT WAS NOT REASONABLY CALCULATED TO PROVIDE NOTICE...................46

V.  THE DISTRICT COURT ERRED AND ABUSED ITS DISCRETION BY BLAMING MR. MEGAS FOR NOT VOLUNTARILY ACCEPTING SERVICE OR APPEARING IN THIS LITIGATION ........................................................................48

CONCLUSION ....................................................................................................50

CERTIFICATE OF BAR MEMBERSHIP ...............................................................51

CERTIFICATE OF COMPLIANCE .......................................................................52

CERTIFICATE OF SERVICE ...............................................................................53

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF .............................54

CERTIFICATE OF PERFORMANCE OF VIRUS CHECK ...............................55

ii

APPENDIX VOLUME I OF II:

Notice of Appeal
    2022.08.12 [ECF62] ................................................................. 1

Notice of Appeal
    2022.08.19 [ECF64] ................................................................. 2

Memorandum Opinion
    2022.07.20 [ECF60] ................................................................. 29

Order
    2022.07.20 [ECF61] ................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Ackermann v. Levine*,
788 F.2d 830 (2d Cir. 1986) ...................................................................... 28

*Agha v. Jacobs*,
2008 WL 2051061 (N.D. Cal. May 13, 2008) .............................................. 31

*Braverman Kaskey, P.C. v. Toidze*,
2013 WL 6095679 (E.D. Pa. Nov. 19, 2013) ................................................ 26

*Budget Blinds, Inc. v. White*,
536 F.3d 244 (3d Cir. 2008) ........................................................................ 18

*Burda Media, Inc. v. Viertel*,
417 F.3d 292 (2d Cir. 2005) .................................................................. 38, 42

*Celgene Corp. v. Blanche Ltd.*,
2017 WL 1282200 (D.N.J. Mar. 10, 2017) .................................................. 25

*Crockett v. Luitpold Pharms., Inc.*,
2020 WL 4039046 (E.D. Pa. July 17, 2020) ................................................ 41

*CRS Recovery, Inc. v. Laxton*,
2008 WL 11383537 (N.D. Cal. Jan. 8, 2008) ............................................... 34

*Dolphin Cove Inn, Inc. v. Vessel Olympic Javelin*,
2020 WL 4927590 (M.D. Fla. Aug. 21, 2020) ............................................. 25

*Elobied v. Baylock*,
299 F.R.D. 105 (E.D. Pa. 2014) ............................................................ 31, 32

*Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*,
480 F. Supp. 3d 977 (N.D. Cal. 2020) ................................................ 35, 37-38

*Feliciano v. Reliant Tooling Co.*,
691 F.2d 653 (3d Cir. 1982) .............................................................. 16-17, 49

*Gold Kist, Inc. v. Laurinburg Oil Co.*,
756 F.2d 14 (3d Cir. 1985) .......................................................................... 49

*Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. Int'l Tech. & Knowledge Co.*,
2019 WL 7049504 (W.D. Pa. Dec. 23, 2019) .............................................. 33

*Indagro, S.A. v. Nilva*,
  2014 WL 1515587 (D.N.J. Apr. 17, 2014) ....................................................... 25

*Intercontinental Indus. Corp. v. Luo*,
  2011 WL 221880 (C.D. Cal. Jan. 20, 2011) ...................................................... 31

*Kiss Nail Prods. v. Shenzhen Jinri Elec. Appliance Co.*,
  2020 WL 4679631 (E.D.N.Y. July 23, 2020) ................................................... 37

*Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*,
  295 F.R.D. 259 (S.D. Ohio 2013) ............................................................... 40-41

*Lonati, S.p.A. v. Soxnet, Inc.*,
  2021 WL 9839476 (C.D. Cal. Sept. 20, 2021) ................................................. 28

*Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'n Identified on
Schedule "A"*,
  391 F. Supp. 3d 816 (N.D. Ill. 2019) ......................................................... 34, 36

*Marcantonio v. Primorsk Shipping Corp.*,
  206 F. Supp. 2d 54 (D. Mass. 2002) ............................................................... 44

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ....................................................................................... 46

*Murray v. The Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804) .......................................................................... 44

*Nagravision SA v. Gotech Int'l Tech. Ltd.*,
  882 F.3d 494 (5th Cir. 2018) .................................................................... 35, 36

*Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equip. Co.*,
  494 F. Supp. 3d 404 (N.D. Tex. 2020) ................................................. 33, 34, 36

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ....................................................................................... 42

*Rio Props. v. Rio Int'l Interlink*,
  284 F.3d 1007 (9th Cir. 2002) .................................................................. 40, 43

*SEC v. Vuuzle Media Corp.*,
  2021 WL 1731947 (D.N.J. May 3, 2021) .................................................. 47, 48

*Sheets v. Yamaha Motors Corp.*,
  891 F.2d 533 (5th Cir. 1990) ..................................................................... 5, 49

*ShelterZoom Corp. v. Goroshevsky*,
2020 WL 4252722 (S.D.N.Y. July 23, 2020) ...................................................... 44

*Smart Study Co. v. Acuteye-Us*,
620 F. Supp. 3d 1382 (S.D.N.Y. 2022) ............................................................. 34

*Sulzer Mixpac AG v. Medenstar Indus. Co.*,
312 F.R.D. 329 (S.D.N.Y. 2015) ...................................................................... 32

*Sunline USA LLC v. Ezzi Grp., Inc.*,
2022 WL 3691021 (E.D. Pa. Aug. 25, 2022) .............................................. 25-26

*Topstone Commc'ns, Inc. v. Xu*,
603 F. Supp. 3d 493 (S.D. Tex. 2022) ............................................................. 34

*Tozer v. Charles A. Krause Milling Co.*,
189 F.2d 242 (3d Cir. 1951) ...................................................................... 18, 50

*United States v. 200 Acres of Land*,
773 F.3d 654 (5th Cir. 2014) ........................................................................... 36

*United States v. $55,518.05 in U.S. Currency*,
728 F.2d 192 (3d Cir. 1984) ............................................................................ 18

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010) ................................................................................... 18, 46

*Viahart, L.L.C. v. GangPeng*,
2022 WL 445161 (5th Cir. Feb. 14, 2022) ....................................................... 36

*Volkswagenwerk AG. v. Schlunk*,
486 U.S. 694 (1988) ................................................................................ *passim*

*Water Splash, Inc. v. Menon*,
581 U.S. 271 (2017) ...................................................................... 5-6, 34, 41

**Statutes**

28 U.S.C. § 1291 .............................................................................................. 1

**Rules**

Fed. R. App. P. 4 .............................................................................................. 1

Fed. R. Civ. P. 4 .............................................................................. *passim*

Fed. R. Civ. P. 60 ............................................... 15, 16, 17, 21, 35

## Other Authorities

4B Charles A. Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* § 1133 (4th ed. April 2020 update) ................................................ 43

Convention (Hague) On The Service Abroad Of Judicial And Extrajudicial Documents In Civil Or Commercial Matters (1965) ...................................... *passim*

Declarations and Reservations of Switzerland, The Hague Conference on Private International Law ...................................................................... 7

International Judicial Assistance in Civil Matters ............................................. 7, 39

Maggie Gardner, *Parochial Procedure*, 69 Stan. L. Rev. 941 (2017) ............. 35, 45

Practical Handbook on the Operation of the Hague Convention of 15 November 1965 On the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters 69 (3d ed. 2006) .................................................... 31

Service of Process, U.S. Embassy in Switzerland and Liechtenstein ...................... 6

SR 272, art. 139 (2017) ............................................................................ 30

Status Table, 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Hague Conference on Private International Law ............................................. 9

Universal Postal Convention, § VIII, art. 38.1.1 ...................................... 31

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this civil enforcement action under Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act, 15 U.S.C. §§ 78u(d)–(e), 78aa(a), and Sections 20(b)–(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b)–(d), 77v(a). The district court entered a default judgment on July 30, 2021. SA72-77. It denied Appellant Thomas Megas's motion to dismiss the default judgment on July 20, 2022. JA29. Megas filed a timely notice of appeal on August 12, 2022, which he amended on August 19, 2022. JA1, JA2; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Was Megas's physical address known to the Securities and Exchange Commission, such that service via the Hague Convention was required?

2. Does the Hague Convention prohibit service of process via email in these circumstances?

3. Does Federal Rule of Civil Procedure 4(f)(3) authorize service of process by email in these circumstances?

4. Was serving Megas via his Hotmail account reasonably calculated to provide notice of the suit?

5. Did the district court err or abuse its discretion in refusing to set aside the default judgment?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This appeal was previously submitted on June 20, 2023. Dkt. 25. It was later removed from the calendar at the Court's direction. Dkt. 26. On September 5, 2023, the Court, on its own motion, appointed the undersigned to serve as *amicus curiae* supporting Appellant Thomas Megas. Dkt. 27.

## INTRODUCTION

The Hague Service Convention governs service of process "in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad," unless "the address of the person to be served with the document is not known." Convention On The Service Abroad Of Judicial And Extrajudicial Documents In Civil Or Commercial Matters, Art. I (1965) (the "Hague Convention" or "Convention"). The Convention requires each signatory State to designate a Central Authority that will attempt to effect foreign service on its residents. The Convention permits, but does not require, signatory States to authorize other forms of service that do not go through their Central Authorities, but Switzerland has opted out of all those other alternatives.

The Securities and Exchange Commission ("SEC" or "Commission") knew Mr. Megas's address in Verbier, Switzerland. The SEC also knew that it was required to serve him under the Convention. But when the Swiss Central Authority reported that it had been unsuccessful in a handful of attempts to effect service, the SEC

convinced the district court that the Convention did not apply at all because Mr. Megas's address was "not known." The district court then authorized the SEC to serve him by email under Federal Rule of Civil Procedure 4(f)(3). Blaming him for failing to "respond to the complaint or otherwise contact the plaintiff or this court, despite evidence he knew of the litigation," the district court entered a default judgment against Mr. Megas and refused to vacate that judgment when he appeared to contest it. JA29.[1]

The email service and default judgment in this case violated the Hague Convention, the Federal Rules, and basic principles of constitutional due process. The SEC knew Mr. Megas's address in Switzerland from the beginning, and both Swiss and American authorities repeatedly confirmed that it was correct. The fact that the Swiss authorities failed to serve Mr. Megas at that address despite several attempts does not authorize the United States to treat his address as "not known" and the Convention as inapplicable. The Convention explicitly contemplates that efforts at service through the receiving State's Central Authority may not initially succeed, and provides that the receiving State will then issue a "certificate" under Article 6 certifying that "the document has not been served" and "set[ting] out the reasons

---

[1] "JA" citations refer to the appendix filed along with this Supplemental Brief of Appointed *Amicus Curiae*. "SA" citations refer to the supplemental appendix previously filed in this Court by the SEC. After consultation with the clerk's office, *amicus curiae* has not duplicated non-mandatory documents in the JA, if they were included in the SA.

which have prevented service." The issuance of such a certificate does not authorize self-help service. To the contrary, Article 15 permits the sending State to proceed to a default judgment without Convention-approved service of process only if six months have elapsed and "no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed." The Convention's requirements can be disregarded, in other words, only when the receiving State has been wholly unresponsive. But here the Swiss authorities did send back a "certificate of any kind," and the SEC did not make "every reasonable effort" to obtain whatever else it wanted.

Because the service in this case violated the Convention it also was inconsistent with the plain text of Federal Rule of Civil Procedure 4(f)(3), which permits service only "by other means not prohibited by international agreement." But even if Mr. Megas's address was unknown and the Convention did not apply, the district court still erred or abused its discretion by relying on Rule 4(f)(3). Rule 4(f)(2) is the primary provision governing service when "there is no internationally agreed means" of service, and it requires compliance with foreign law. Rule 4(f)(3) provides a backstop for extraordinary situations, such as when a foreign State is ignoring or defying its treaty obligations. Resorting to that Rule without careful consideration of international comity and the available options for service consistent with foreign law is, at a minimum, an abuse of discretion.

4

The district court also violated due process by authorizing service by a method that was less likely to supply actual notice than other available alternatives. Rather than continue efforts to serve Mr. Megas at his known address, the SEC resorted to an email address—and not even Mr. Megas's primary email address. It picked a rarely used Hotmail account (hosted on a U.S. server) instead of Mr. Megas's regular email address (hosted on a Swiss server) specifically to avoid violating Swiss law that prohibits service of process through private channels.

Finally, the district court misunderstood this situation by concluding that it could deny relief because Mr. Megas was "culpable" and "sle[pt] on [his] rights." JA39, JA42. A default judgment based on invalid service of process is void as a matter of law. And even if the equities were important, service of process is the plaintiff's obligation and Mr. Megas "was well within [his] right to insist on service pursuant to the Hague Convention." *Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 536 (5th Cir. 1990). Mr. Megas is a resident of Switzerland and was under no duty to volunteer himself for litigation in a foreign country.

## STATEMENT OF THE CASE

### Legal Background

The United States and Switzerland are both parties to the Hague Service Convention, a multilateral treaty whose purpose is "to simplify, standardize, and generally improve the process of serving documents abroad." *Water Splash, Inc. v.*

*Menon*, 581 U.S. 271, 273 (2017).[2] The Convention, in its own words, "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad," unless "the address of the person to be served with the document is not known." Art. 1. As the Supreme Court has held, "[t]his language is mandatory," and compliance with the Convention is required "in all cases to which it applies." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988).

The Convention's "primary innovation," described in Articles 2 through 6, is its requirement that each member nation designate a Central Authority to receive and execute international requests for service of process. *Id.* at 698. The Central Authority must serve the documents by a method that is compatible with its domestic laws, and then inform the applicant whether service was successful. *See* Arts. 2–7. This is the "main channel" for service under the Convention, and it is always available. Article 6 contemplates that when a document is transmitted for service through the main channel the Central Authority "shall complete a certificate in the form of the model annexed to the present Convention," which "shall state that the document has been served and shall include the method, the place and the date of

---

[2] *See* JA111; *see also* Service of Process, U.S. Embassy in Switzerland and Liechtenstein, https://ch.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/living-in-ch/judicial-information/service-process/.

service and the person to whom the document was delivered" or, "[i]f the document has not been served, . . . shall set out the reasons which have prevented service."

The Convention also contemplates alternative methods of service. Article 10 says that, "provided the State of destination does not object," service may be effected through postal channels, or by direct contact between judicial officers or other officials without going through the Central Authority. Switzerland has objected to Article 10 in its entirety, so it is inapplicable.[3] As guidance issued by the Swiss Federal Office of Justice explains, "[a]ccording to the Swiss view—as well as that of numerous other states—the service of judicial or extra-judicial documents as well as the obtaining of evidence for court proceedings constitute the exercise of public powers" and "cannot simply be undertaken from beyond the frontiers of the state concerned without authorisation" without "violat[ing] the sovereignty of the state."[4] The SEC acknowledged that reality in its briefing below, when it explained that it chose to serve Mr. Megas's Hotmail email address rather than his more commonly employed email address because Hotmail's servers are in the United States, and the

---

[3] Declarations and Reservations of Switzerland, The Hague Conference on Private International Law, *available at* http://www.hcch.net/index_en.php?act=status. comment&csid=424&disp=resdn ("[S]witzerland declares that it is opposed to the use in its territory of the methods of transmission provided for in Articles 8 and 10.").

[4] International Judicial Assistance in Civil Matters, at 2, *available at* https://www.rhf.admin.ch/rhf/fr/home/zivilrecht/wegleitungen.html.

Commission was concerned that serving a Swiss-hosted email address would violate Swiss law. *See* JA156 n.1.

Article 11 says that the Convention "shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for" by the Convention. To our knowledge, Switzerland and the United States have not agreed to service through any channels other than the main channel.

Article 19 makes clear that the Convention does not preempt "methods of transmission" for service of process originating abroad that are provided for by "the internal law of a Contracting State." Again, however, Swiss law treats service of process as a governmental function and it appears that Switzerland would not even permit a Swiss domestic litigant to serve anyone by email.

The Convention also specifies the conditions for entry of a default judgment. Whenever "a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared," Article 15 states that "judgment shall not be given until it is established that" particular requirements have been satisfied. Article 15 offers two different paths to default judgment. The first part, which we will call Article 15(1), permits default judgment if:

a) the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or

b) the document was actually delivered to the defendant or to his residence by another method provided for by this Convention, and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend.

The second pathway, which we will call Article 15(2), provides that:

Each Contracting State shall be free to declare that the judge, notwithstanding the provisions of the first paragraph of this Article, may give judgment even if no certificate of service or delivery has been received, if all the following conditions are fulfilled—

a) the document was transmitted by one of the methods provided for in this Convention,

b) a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,

c) no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

Notwithstanding the provisions of the preceding paragraphs the judge may order, in case of urgency, any provisional or protective measures.

The United States has made the "declar[ation]" necessary to authorize default judgments under Article 15(2).[5] "[C]ertificate of any kind" refers to the certificates

---

[5] Status Table, 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Hague Conference on Private International Law, *available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=17.

contemplated by Article 6—which either can certify that service was achieved or certify that service *was not* achieved and "set out the reasons which have prevented service." Article 15(2) requires, in other words, that the Central Authority of the receiving State must have wholly failed in its obligation to deliver a certificate either way, "even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed."

**Facts and Proceedings Below**

The critical threshold question in this case is whether Mr. Megas's address was "known," triggering the Article I coverage of the Hague Convention. *Amicus curiae* believes that the district court's contrary conclusion was based on a misunderstanding of the law and that there is no genuine dispute about the pertinent facts. The following summary draws from the evidence that both Megas and the SEC offered in the district court.

**I.      The SEC's Initial Knowledge Of Megas's Address**

In March 2020, the SEC named Mr. Megas as a defendant in a civil enforcement action in the Eastern District of Pennsylvania, just as the novel coronavirus forced the world into a months-long lockdown. JA54. In its Complaint, the SEC identified Megas as a 77-year-old British national residing in Verbier, Switzerland. JA57. According to Commission counsel, the SEC "had substantial evidence" when it filed its case that Megas resided in Verbier at Route de Corberaye

18A Le Chable / Villette 1934. JA82; *see also* JA80. The SEC's knowledge of Megas's Swiss address "was based primarily upon documents and other evidence the Commission obtained in the course of a multi-year investigation that preceded this litigation, including Megas' personal bank records that were dated as recently as March 2019." JA82. The SEC alleged that Megas and his co-defendant, Todd Lahr, violated federal securities laws during a three-year period ending in 2017. JA54.

Lahr is no longer a party to this case. The district court entered a final judgment against Lahr in June 2020 after he settled his claims with the SEC. SA30-35. The case against Megas continued.

## II.     The SEC Fails To Serve Megas Under The Hague Convention

Because Switzerland is a signatory to the Hague Convention, the SEC sent a service request to the Swiss Central Authority in early April 2020. JA80. The SEC told the Swiss authorities that Megas resides at his known address: Route de Corberaye 18A Le Chable / Villette 1934. JA82. After confirming that Megas actually resides at Route de Corberaye *18C*, not 18A, the Swiss officials proceeded to attempt service there. JA82 n.1. In mid-May, the Swiss authorities informed the SEC that they were unable to serve Megas at that address but that they had spoken with him on the phone. SA84. Their letter reports that Megas stated that he would be abroad until late August 2020. SA84.

On May 26, the district court instructed the SEC that it must effect service by June 23, 2020, or the case would be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure. JA31. Three weeks passed before the SEC requested its first of three extensions to the service deadline. JA31. In support of its motion, the SEC told the district court for the first time about its inability to serve Megas at his known Swiss address. JA80-81. But given the Swiss authorities' assurance that they would re-attempt service in September 2020, the district court granted the SEC's request for an extension. SA29.

On October 2, the SEC asked Swiss authorities what options were available under Swiss law to properly notify Megas of the lawsuit. JA141-42. The Swiss court responded a week later with a memo of available options. JA142. Neither the memo nor the options discussed in it have been produced or discussed by the SEC thus far.

The Swiss authorities again tried to contact Megas via telephone and to effect service at his known address, but they were unsuccessful. JA83-84. A Swiss official told the SEC that they would make one more attempt to serve Megas in person on October 11. JA83. According to a declaration from Commission counsel, the Swiss official further advised that "they d[id] not know where Megas [wa]s currently located because no one ha[d] been seen at Megas's home address, and that Megas had not been seen in the area." JA161. The final attempt also failed, and the Swiss

authorities informed the SEC that they were returning its Hague Convention service request as unexecuted. JA127.

The SEC then requested its second extension—this time for sixty days. SA174-76, SA36. The district court granted the request and extended the service deadline to December 14, 2020. SA36.

A request to the Commission's Swiss counterpart, the Swiss Financial Market Supervisory Authority ("FINMA"), only confirmed what the SEC already knew: that Megas was domiciled at his known address in Verbier. JA84, JA92-93. The SEC's request for Megas's travel records was denied because FINMA did not have the authority to request Megas's travel records. JA92. A similar request to the U.S. Department of Homeland Security did not provide any useful information. SA80. The SEC also learned little from Megas's U.S. contacts, including Lahr. SA80.

Then, the SEC tried two new tactics: an internet search and an email. First, the Commission used an internet search to obtain publicly-accessible material listing Megas as a current or former director of four companies in the United Kingdom. SA80. The records included the companies' physical addresses. Second, on October 27, 2020, Commission counsel sent a message to tpm14@hotmail.com, one of several email addresses that the Commission obtained during its investigation into the underlying civil claims. SA80. The SEC explained below that it chose this email, which is hosted on a U.S. server, over Megas's more frequently used Swiss-hosted

email accounts because "the Commission did not want to raise the possibility that serving a Swiss-based email address might run afoul of Swiss law prohibiting email service." JA156 n.1. The SEC sent the message using RPost, a platform that provides proof of delivery and a receipt if the recipient opens the email. SA80-81, JA85-86. RPost confirmed that the email message to Megas's Hotmail address was successfully delivered. SA80-81, JA85-86. RPost has never indicated that anyone— let alone Thomas Megas—actually *opened* the October 27 email. JA86.

By December, the SEC sought a third extension of the service deadline. SA175-76. This time, the SEC made two requests: (1) that the district court authorize alternative service via Megas's Hotmail email address, or (2) that it grant the Commission an extension to attempt service in the United Kingdom at the newly-discovered corporate addresses. SA175-76. The district court granted the motion and again extended the service deadline to May 28, 2021. SA37.

The SEC tried to serve Megas in the United Kingdom, without success. JA33.

### III. The SEC Purports To Serve Megas By Email

After securing the district court's approval to attempt service via email, the SEC sent a single message to Megas's Hotmail account on February 10, 2021. JA97. Attached were copies of the Summons, the Complaint, and the order from the district court authorizing alternative service by email. JA97. The SEC received a response stating simply: "AUTOMATED RESPONSE. It has not been possible to deliver your

message to tpm14@hotmail.com as the email address does not appear to be in use." JA99. The SEC testified that RPost confirmed *delivery* of the February 10, 2021 email, but conspicuously did not claim that RPost generated a *read receipt* confirming that the email was ever opened. *See* SA39. Its position appears to be that someone set up a user-customizable but automated response on that account sometime between October 27 and February 10.

The SEC then moved for a default judgment on the assumption that it had satisfied its service obligations with the February 10 email. JA33. Commission counsel attempted to serve Megas with the motion via email, but another automated reply from Hotmail indicated that the account had been deactivated. JA33. On July 30, 2021, the district court granted the SEC's motion. SA72. The default judgment, among other obligations, required Megas to pay disgorgement of $30,755, pre-judgment interest of $8,719, and a civil penalty of $487,500. SA72-77.

### IV. Megas Contests The Default Judgment

Megas learned about the default judgment two days after it was issued, and engaged Swiss lawyers to help him respond. SA104. On August 5, Megas filed a motion in the district court to dismiss the default judgment on several grounds, including that the SEC had failed to properly serve him in accordance with the Hague Convention. JA37. Among other arguments, Megas pointed to Rule 60(b)(4), which permits a district court to dismiss a default judgment when "the judgment is void."

JA41. Megas argued that the judgment was void because service via his Hotmail account was impermissible. JA41-43.[6]

The district court scheduled a hearing on Megas's motion, but the court maintained that he must travel to the federal courthouse in Easton, Pennsylvania. JA113. Megas repeatedly requested a telephonic hearing, citing his advanced age, his continuing health problems, and the simple fact that the coronavirus had shuttered international travel for the foreseeable future. JA114. The district court continued to deny his requests. JA147-49. It was not until Megas was forced to miss an in-person hearing that the court agreed to two telephonic sessions—an evidentiary hearing in November 2021 and a final oral argument in January 2022. JA150-51.

## V. The District Court Denies Megas's Motion

The district court denied Megas's motion to dismiss the default judgment in July 2022. JA29. It began its analysis of the Rule 60(b) issues by weighing *sua sponte* the three factors that this Court set forth in *Feliciano v. Reliant Tooling Co.*,

---

[6] Megas raised two additional claims. First, he argued that the district court lacked personal jurisdiction over him. Second, he invoked Rule 60(b)(3), which permits a court to vacate a final judgment where there is "fraud . . . misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Mr. Megas wishes to preserve those arguments. Undersigned *amicus curiae* has focused this supplemental brief on the three questions posed in this Court's supplemental briefing order, on the closely related question of how Rule 4(f)(3) should be understood, and on the district court's understanding of Rule 60(b)(4). We have discussed the substance of these arguments with Mr. Megas, and he has informed us that he does not intend to file any further supplemental briefing himself.

691 F.2d 653, 656 (3d Cir. 1982). JA38; *but see* Dkt. 16, Brief of Securities and Exchange Commission, at 31 n.5 (acknowledging that "*Feliciano* applies only to motions for relief from judgment under Rule 60(b)(1), which is not at issue here"). The district court concluded that the first factor—prejudice to the plaintiff—weighed in Megas's favor. JA38 ("[T]he SEC has not demonstrated any prejudice would ensue if the court granted Mr. Megas's motion to dismiss the default judgment."). But the court thought the other two factors—meritorious defense and culpable conduct—cut against him. JA38-39. Because Megas had "not presented a meritorious defense" while "willfully avoid[ing] timely action in this matter," the district court held that the discretionary *Feliciano* factors favored denying Megas's motion. JA39.

"For the sake of thoroughness," the district court turned to Megas's arguments for dismissing the default judgment. JA29. The court reasoned that it had already deemed email service "proper" in ruling on the SEC's motion for a default judgment. JA42. Thus, the court held, Megas had not provided "any evidence of a 'jurisdictional error or . . . a violation of due process'" warranting relief under Rule 60(b)(4). JA42. The court did not address any of Megas's supplemental briefing on the Hague Convention's compatibility with email service. Instead, the district court reasoned that "Rule 60(b)4) does not permit Mr. Megas to 'sleep on' his rights."

JA42-43 (quoting *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010)).

The district court acknowledged that "[t]he Swiss authorities . . . confirmed Mr. Megas was legally domiciled at the address" in Verbier that has been known by the Commission from the time the complaint was filed in this case. JA31.

## STANDARD OF REVIEW

This Court generally reviews denials of Rule 60(b) motions for abuse of discretion, but an order denying a Rule 60(b)(4) motion to set aside a default judgment as void is subject to "plenary" review. *Budget Blinds, Inc. v. White*, 536 F.3d 244, 251 & n.5 (3d Cir. 2008). "[T]his [C]ourt does not favor entry of defaults or default judgments." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984). Rather, this Court "require[s] doubtful cases to be resolved in favor of the party moving to set aside the default judgment." *Id.* at 194–95 (citations omitted). "Any doubt should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits." *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir. 1951).

## SUMMARY OF ARGUMENT

The present structure of Rule 4(f) is the product of substantial amendments in 1993 to reflect and implement the requirements of the Hague Service Convention. Rule 4(f)(1) authorizes service by internationally agreed means such as the

Convention. "[I]f there is no internationally agreed means, or if an international agreement allows but does not specify other means," then Rule 4(f)(2) authorizes service as prescribed by foreign law or directed by foreign officials—or, "unless prohibited by the foreign country's law," by delivery to the person directly. Rule 4(f)(3) authorizes service "by other means not prohibited by international agreement, as the court orders." The 1993 Advisory Committee Notes indicate that it was intended for situations "when the signatory state was dilatory or refused to cooperate for substantive reasons." Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments). The district court erred or abused its discretion by relying on that provision here, for several reasons.

First, the Hague Convention applies here and the Supreme Court has made clear that "compliance with the Convention is mandatory in all cases to which it applies." *Schlunk*, 486 U.S. at 705. The SEC convinced the district court that this case is outside the Convention's Article I coverage because Mr. Megas's address was "not known." But Megas's address has been known to the SEC from the inception of this litigation and it was repeatedly confirmed by both Swiss and American authorities. The SEC and the district court appear to have concluded that the Swiss authorities' failure to serve Megas at that address in a timely fashion renders his address *constructively* unknown. That leap profoundly misunderstands the

19

Convention, which anticipates that efforts to effect service at a known address may be unsuccessful and specifies what should happen next.

Second, Rule 4(f)(3) only permits the district court to authorize service "by . . . means not prohibited by international agreement." Switzerland has opted out of all the alternative service options under the Convention, so the only permissible way to serve a Swiss resident is through the Swiss Central Authority. Private service by email (or any other means) therefore is "prohibited by international agreement" and a violation of Rule 4(f)(3) as well as the Convention. The district court also separately violated Article 15—which, in the absence of service in a manner permitted by the Convention, permits a default judgment only if "no certificate of any kind" has been received despite "every reasonable effort" to obtain one. The Swiss authorities were in regular communication with the SEC, and sent several formal communications explaining that service had not yet been effected and why. Those communications qualify as Article 6 "certificate[s]," and if not then the SEC cannot show on this record that it exerted every reasonable effort to obtain a certificate in the proper form. Either way, Article 15(2) is not satisfied.

Third, even if the Convention did not apply the district court erred or abused its discretion in authorizing reliance on Rule 4(f)(3) without careful consideration of whether service could have been effected consistent with Rule 4(f)(2) and the domestic law of Switzerland. Rule 4(f)(3) is a backstop provision meant for unusual

situations. It should not be understood in a manner that would functionally swallow Rule 4(f)(2). The record reflects that the Swiss authorities sent the SEC a memo outlining options for serving Mr. Megas consistent with Swiss law. That memo is not in the record, but it appears that service by publication—effected by the Swiss authorities themselves—would have been a last-resort option. The Advisory Committee notes indicate that even if resort to Rule 4(f)(3) becomes necessary "an earnest effort should be made to devise a method of communication that is consistent with due process and minimizes offense to foreign law." Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments).

Fourth, service at this email address was not reasonably calculated to inform Mr. Megas of this litigation because the SEC had better options, either in the form of continued efforts to serve him in person or, at a minimum, service at his primary email address. The SEC should not be heard to claim simultaneously that Mr. Megas no longer has any presence at his Swiss address and that it could not use his primary email address because he is a Swiss resident.

Finally, the district court misunderstood Mr. Megas's obligations and Rule 60(b)(4) when it denied relief on the ground that Mr. Megas acted in bad faith or slept on his rights. A judgment entered in violation of the Convention is simply void. And Mr. Megas had no obligation to volunteer himself for litigation thousands of

miles away, in a different country, when service had not been effected under the Convention.

## ARGUMENT

### I. MEGAS'S ADDRESS WAS KNOWN AND THEREFORE THE HAGUE CONVENTION APPLIES

The district court concluded that this case falls into a limited exception to the Hague Convention for circumstances in which "the address of the person to be served . . . is not known," Art. 1, and therefore authorized service by email. But the SEC knew Mr. Megas's address from the beginning of this case and it was repeatedly confirmed by the Swiss authorities. There is no real dispute about his address.

The court's holding appears, instead, to rest on the misconception that a defendant's address is "not known" if he cannot be found at his home address within a reasonable period of time. That approach wrongly conflates an individual's known address with their known whereabouts, and does violence to the provisions of the Convention that contemplate this exact situation.

#### A. Mr. Megas's Address Was Known By The Commission Early In This Litigation, And Its Validity Has Been Repeatedly Confirmed

If the district court made a factual finding that Mr. Megas's address was genuinely "not known," then that finding is clearly erroneous. Mr. Megas's address is and has been known throughout this litigation.

The SEC admits that it first identified Megas's address before it even filed its Complaint. During the multiyear investigation that preceded this litigation, the SEC obtained Megas's Swiss address through bank records and other documents. When it came time to file its Complaint, the SEC identified Megas as a "resident of Verbier, Switzerland," JA57, and confirmed that it "was aware that Defendant Megas resided in Switzerland, at Route de Corberaye 18A Le Chable / Villette 1934." JA80. Knowing that Megas resided in Switzerland, the Commission attempted to serve Megas via the Hague Convention. JA80, JA88-90.

When the Swiss Central Authority responded to the Commission's request under the Hague Convention, it confirmed that Megas's address was not at Route de Corberaye 18A but at 18C. Per the Central Authority, "[a]ccording to the registration office of the municipality of Bagnes, [Megas] is legally domiciled at Route de Corberaye 18C, 1934 Le Châble." SA84. But the Central Authority attempted to serve Megas at the correct address, so that small confusion was harmless. And the district court acknowledged that "[t]he Swiss authorities . . . confirmed Mr. Megas was legally domiciled at th[at] address." JA31.

Later in 2020, Megas's address was confirmed once again in FINMA's response to the Commission's request for information. FINMA reiterated not only that Megas's address at Le Châble was his "last known address" but that "competent authorities have confirmed that Mr. Megas is currently still registered at this address"

23

as of November of 2020. JA92. The information FINMA provided indicated that Megas was active in several local organizations near his address, and that his involvements were as recent as the time that service was attempted by the Central Authority. JA92.

The Commission has argued that its unsuccessful attempts to locate Megas support a conclusion that his address was unknown. But that claim ignores the fruits of the Commission's efforts, which in fact confirmed repeatedly that Mr. Megas continued to reside at Route de Corberaye 18C, 1934 Le Châble. None of the Commission's efforts turned up evidence that Megas resided anywhere different than his Verbier residence.

The Commission has attempted to portray the U.K. addresses as possible residential addresses, but this contention is implausible. The U.K. addresses were places of incorporation for businesses and were not residential in nature. JA84-85.

The Commission has argued that the Central Authority's failure to serve Megas in Switzerland somehow revealed that he maintained no "actual presence" at his addresses there. To the contrary, FINMA confirmed that Megas was active in local civic organizations. JA92. Just because the Swiss authorities failed to find Megas at his known address on a few occasions, at the height of a global pandemic, does not mean that he had no presence at that address.

The Commission has also argued that it was entitled to treat Mr. Megas's address as unknown because it could not locate him despite reasonably diligent efforts. Those arguments misunderstand the case law. When a defendant's address is genuinely unknown, courts require plaintiffs to exercise "reasonable diligence" to discover the address before treating the Convention as inapplicable. *See, e.g.*, *Indagro, S.A. v. Nilva*, 2014 WL 1515587, at *4 (D.N.J. Apr. 17, 2014). But that does not mean that reasonably diligent efforts to serve the defendant at his known address somehow render the address unknown.

The more pertinent cases are those in which reasonable investigation reveals genuine evidence that a defendant has moved—suggesting that his previously "known" address may no longer be accurate. Those cases require actual evidence that the defendant no longer resides at the known address. In *Celgene Corp. v. Blanche Ltd.*, 2017 WL 1282200 (D.N.J. Mar. 10, 2017), for example, an "investigator[] determined that Blanche maintain[ed] no actual presence" at his previous address. *Id.* at *3. The same was true in *Dolphin Cove Inn, Inc. v. Vessel Olympic Javelin*, 2020 WL 4927590 (M.D. Fla. Aug. 21, 2020), where the defendant had told authorities he "was in St. Vincent" at an undisclosed address "and would only be returning to the US periodically" at his previous addresses. *Id.* at *3; *see also Sunline USA LLC v. Ezzi Grp., Inc.*, 2022 WL 3691021, at *4 n.2 (E.D. Pa. Aug. 25, 2022) (defendant's "address [was] unknown as there was no indication that Ezzi was

25

still located at the Leslie Street address when the process server attempted to serve Ezzi there"). And in *Braverman Kaskey, P.C. v. Toidze*, 2013 WL 6095679 (E.D. Pa. Nov. 19, 2013), the defendant moved from Canada to Russia. Because the defendant's address in Russia was unknown, the Court found that the Hague Convention no longer applied. But, the court noted, "[h]ad [the defendant] continued to reside at her last known address," the Hague Convention would have applied. *Id.* at *4. None of those cases treated uncertainty about the defendant's immediate whereabouts as establishing that his address was unknown.

The record is unclear about Mr. Megas's physical location in 2020 and early 2021, so if his whereabouts mattered there would be factual questions to resolve. The Swiss authorities reported that Megas told them he was away at the time of their initial contacts and would be returning to Switzerland later in the year. SA84. Megas later testified that he was in Switzerland during the time service was attempted. SA39-40. Ultimately, however, that potential fact dispute does not matter. The Convention's coverage is not tied to the defendant's physical whereabouts but to whether his regular address was known. It was.

**B**. **The Structure Of The Convention Precludes The SEC's Expansive Interpretation Of When An Address Is "Not Known"**

The SEC and the district court appear to have concluded that the Swiss Central Authority's failure to serve Mr. Megas at his Verbier address rendered his address "not known" under Article I, and the Convention wholly inapplicable. That is not a

plausible reading of the Convention, which specifies that it "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad," Art. 1, and specifies exactly what is supposed to happen if attempts to serve the defendant at his known address are unsuccessful.

The Convention's answer *is not* that the plaintiff or the sending State can treat the defendant's address as constructively unknown and ignore the Convention. Instead, when a document is transmitted to the Central Authority of the receiving State and "the document has not been served," Article 6 requires that the Central Authority "shall complete a certificate" stating the failure of service and "set[ting] out the reasons which have prevented service." The Convention also addresses the circumstances in which default judgment can be granted, specifically including when a default judgment can be granted after a failed attempt at service through the Central Authority. Article 15(2) permits default judgment only when "no certificate of any kind has been received" despite "every reasonable effort" to obtain one. *Id.* As the Supreme Court explained in *Schlunk*, "compliance with the Convention is mandatory in all cases to which it applies . . . and Articles 15 and 16 provide an indirect sanction against those who ignore it." 486 U.S. at 705.

That framework makes clear that the United States cannot authorize a default judgment simply because efforts to serve Mr. Megas under the Convention were

tried without success. If a defendant's address becomes "not known," and the Convention wholly inapplicable, whenever attempts at service were unsuccessful, then the specific requirements of Article 15(2) would be effectively nullified.[7]

The approach pursued by the SEC and the district court here would eviscerate the obvious plan of the Convention and have consequences that the United States will find unacceptable when the shoe is on the other foot. The Hague Convention's purpose was to "unify[] the rules of service of process abroad," *Ackermann v. Levine*, 788 F.2d 830, 840 (2d Cir. 1986), but it makes no promise that attempts to serve a defendant will be successful. Taken to its logical conclusion, however, the district court's reasoning would mean that virtually any time service is attempted under the Hague Convention unsuccessfully, the Convention no longer applies and service (and entry of default judgment) is entirely at the whim of the *sending* State's law. That cannot be right. If the district court can declare Mr. Megas's address "not known" in this case and then authorize service by email merely because service at his known address was unsuccessful, then the courts of any signatory country (*e.g.*,

---

[7] Article 15 also provides that a court "may order, in case of urgency, any provisional or protective measure." Art. 15. But even if service by email could be authorized by that provision when genuinely necessary to prevent irreparable harm, there was no such "urgency" here. *See, e.g.*, *Lonati, S.p.A. v. Soxnet, Inc.*, 2021 WL 9839476, at *3 (C.D. Cal. Sept. 20, 2021) (authorizing email service under the urgency exception to Article 15 upon a showing of irreparable harm). Obviously, the Commission would like to proceed with its enforcement action against Mr. Megas, but it has never identified any immediate need for temporary protective measures.

Azerbaijan, Belarus, Botswana, Kazakhstan, Russia, and Venezuela) can do the same to any American citizen in private litigation.

## II. SERVICE BY EMAIL AND DEFAULT JUDGMENT WERE "PROHIBITED BY INTERNATIONAL AGREEMENT" HERE, AND THEREFORE RULE 4(F)(3) WAS UNAVAILABLE

Service by email was "prohibited by international agreement" within the meaning of Rule 4(f)(3) here. The Convention requires service through the Central Authority of the receiving State unless some other service channel is specifically authorized. Switzerland formally objected to all of the optional private service channels, has not agreed to private service in any other way, and appears to forbid private service to its own citizens in domestic litigation. An attempt to serve a Swiss resident by private email is plainly forbidden by the Convention.

The SEC and the district court also could not rely on Article 15(2), which under limited circumstances permits the sending State to authorize default judgment based on service methods of its own choosing. Article 15(2) is available only when "no certificate of any kind" has been received despite every reasonable effort to obtain one. Switzerland sent multiple qualifying communications, and if anything was missing the SEC did not exert every reasonable effort to obtain it.

### A. There Was No Valid Service Under The Hague Convention

There was no valid service of process under the Hague Convention in this case. The SEC's attempt to serve Mr. Megas by email obviously does not qualify as

service through the Convention's "main channel" for the simple reason that the email in question was sent by the SEC, not the Swiss Central Authority. Nor does this email qualify under any of the alternative channels contemplated by the Convention. Article 11 permits signatories to agree to additional methods of service among themselves, but the United States and Switzerland have not. Both Article 19 and Article 15(1) contemplate service by other methods permitted by the domestic law of the receiving State, but Swiss law apparently does not permit private litigants to effect service by *any* means. And even for public authorities, service by email is permissible in Switzerland only with the party's consent.[8]

Switzerland's blanket objection to Article 10 underscores how impermissible the private email service in this case was. Article 10 directly addresses the issue of service by "postal channels" and other methods involving direct service by foreign litigants or officials that do not go through the Central Authority. But Article 10 applies only "[p]rovided the State of destination does not object." Switzerland has objected. That objection has to be understood as encompassing purported private service by email. Indeed, email is *at best* a "postal channel" within the meaning of Article 10(a). The Convention does not define the term "postal channels," and of

---

[8] Article 139 of the Swiss Civil Procedure Code, which governs electronic service in domestic settings, reads, "*With the consent of the person concerned*, summonses, rulings and decisions may be served electronically." SR 272, art. 139 (2017) (emphasis added). Megas never consented to email service—by the Commission or anyone else.

course it was drafted and ratified in the late 1960s, long before email existed. But the United States and Switzerland are signatories to the Universal Postal Convention, which defines "electronic postal mail" as an "electronic postal service involving the transmission of electronic messages." Universal Postal Convention, § VIII, art. 38.1.1. And the Permanent Bureau of the Hague Conference on Private International Law has pronounced that postal channel "certainly covers . . . telegrams and telex." *Intercontinental Indus. Corp. v. Luo*, 2011 WL 221880, at *2 (C.D. Cal. Jan. 20, 2011) (quoting Practical Handbook on the Operation of the Hague Convention of 15 November 1965 On the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters 69 (3d ed. 2006)); *see also Agha v. Jacobs*, 2008 WL 2051061, at *2 (N.D. Cal. May 13, 2008) ("[Plaintiff's] attempt to distinguish email and facsimile from the 'postal channels' referred to in the text of Article 10 is unavailing.").

A district court in this circuit has interpreted Switzerland's Article 10(a) objection to prohibit email service. In *Elobied v. Baylock*, a plaintiff in the Eastern District of Pennsylvania sought permission from the district court to serve the defendants via email under Rule 4(f)(3). 299 F.R.D. 105, 106–07 (E.D. Pa. 2014). Both defendants were located in Switzerland. *Id.* at 107. The court began by noting the potential obstacle posed by Article 10: "[T]he Convention provides for service on a person located abroad through 'postal channels' . . . an expression which might

be interpreted to allow for service via e-mail." *Id.* at 108. But email service was not allowed, the court explained, because Switzerland had expressly objected to Article 10's alternative service methods. *Id.* The only way to serve an individual located in Switzerland is "through the Swiss Central Authority, as outlined in Hague Convention Articles 2 through 6." *Id.*

Some courts have reasoned that email does not fall within the term "postal channels," and that a country's Article 10(a) objection does not bar service by email. Instead, they conclude that when a country specifically objects to service by "postal channels," the negative implication is that they have impliedly agreed to email service absent a separate objection. *See, e.g.*, *Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 331–32 (S.D.N.Y. 2015). That conclusion is entirely unpersuasive, in this case and generally. It is particularly wrongheaded here, when Switzerland did not just object to private service by "postal channels" but to *all* of the private (and semi-private/semi-official) service channels contemplated by Article 10. Consistent with its civil law traditions, Swiss law appears to permit service in both foreign and domestic litigation *only* through official Swiss government channels. Its blanket objection to Article 10 ensures that the Convention does not open up methods of service for foreign litigants that Switzerland would not permit to its own citizens.

Those Switzerland-specific considerations should be dispositive here. But even as a general matter the better reasoned cases recognize that it "elevates form over substance" to conclude that a country that has lodged an Article 10(a) objection "has implicitly indicated that it would accept service by email." *Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. Int'l Tech. & Knowledge Co.*, 2019 WL 7049504, at *4 (W.D. Pa. Dec. 23, 2019). Article 10(a) is unique in that a country that wishes to disregard its terms is *required* to file an objection; the Article's enumerated service methods—including "postal channels"—are "specifically permitted *unless objected to*." *Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equipment Co.*, 494 F. Supp. 3d 404, 416 (N.D. Tex. 2020). The Convention does not offer countries any similar opportunity to object to email, since email is not, and could not have been, mentioned. It did not exist when the Convention was drafted and ratified.

In *Schlunk*, the Supreme Court addressed whether the Convention permits service of process via *notification au parquet*—a French practice in which service on a foreign defendant is completed by depositing documents with a designated local official. 486 U.S. at 703. Like email, the Convention makes no mention of *notification au parquet*. Considering the Convention's text, purpose, and drafting history, "[t]here is no question," the Court concluded, "that the Conference wanted to eliminate *notification au parquet*." *Id.* In other words, "the drafters of the Hague Service Convention intended to prohibit a method of service not mentioned in its

33

text." *Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, 391 F. Supp. 3d 816, 825 (N.D. Ill. 2019). In *Water Splash*, the Court understood *Schlunk* to hold that the Hague Convention "specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it applies." 581 U.S. at 273 (quoting *Schlunk*, 486 U.S. at 699).

Several district courts have held post-*Water Splash* that the Convention prohibits service methods—including email—that are not authorized by its terms. *See, e.g.*, *Topstone Commc'ns, Inc. v. Xu*, 603 F. Supp. 3d 493, 500 (S.D. Tex. 2022); *CRS Recovery, Inc. v. Laxton*, 2008 WL 11383537, at *1–2 (N.D. Cal. Jan. 8, 2008). Many focus their analysis on *Schlunk* and *Water Splash*. *See, e.g.*, *Prem Sales, LLC*, 494 F. Supp. 3d at 417 ("[T]he [Supreme] Court's reasoning implies that the Convention may preclude a particular service method even where the text does not expressly say so."). Those decisions are sound. "Articles 11 and 19 provide ready tools to permit countries to expressly permit service by email" if they want to. *Smart Study Co. v. Acuteye-Us*, 620 F. Supp. 3d 1382, 1394 (S.D.N.Y. 2022). If the Convention permitted any service method that is not expressly addressed by its text, Articles 11 and 19 "would be largely superfluous." *Id.*; *see also Water Splash, Inc.*, 581 U.S. at 277 (refusing to adopt a reading of Article 10(a) that would make it redundant). And "[u]sing a method of service that is not enumerated in the Convention would be tantamount to not 'apply[ing]' the Convention, which is

expressly prohibited." *Facebook, Inc. v. 9 Xiu Network (Shenzen) Tech. Co.*, 480 F. Supp. 3d 977, 983 (N.D. Cal. 2020). In Professor Gardner's words: "[U]nless the Convention does not apply by its own terms, any method of service not approved by the Convention is effectively prohibited." Maggie Gardner, *Parochial Procedure*, 69 Stan. L. Rev. 941, 1000 (2017).

The Fifth Circuit's decision in *Nagravision SA v. Gotech International Technology Limited*, 882 F.3d 494 (5th Cir. 2018), is not to the contrary. There, a Chinese defendant sought relief from a default judgment under Rule 60(b) on the ground that it was improperly served by email. The Fifth Circuit summarily concluded that the defendant "ha[d] not shown that such service is prohibited by international agreement." 882 F.3d at 498. The defendant's argument failed, the court explained, "because service was not effected pursuant to the Hague Convention, and that agreement does not displace Rule 4(f)(3)." *Id.* But the Appellee's brief in that case explained that more than eight months had elapsed without any response from the Chinese Central Authority, and that Article 15 therefore permitted default judgment at the discretion of the United States. *See* Brief of Appellee Nagravision SA, 2017 WL 1037261, at *53 (Mar. 9, 2017). The Fifth Circuit's cryptic statements that "service was not effected pursuant to the Hague Convention" and that the Convention "does not displace Rule 4(f)(3)" should be understood against that backdrop, particularly since the Fifth Circuit relied exclusively on a case involving

a party whose address was unknown, *see Nagravision*, 882 F.3d at 498 (citing *United States v. Real Prop. Known As 200 Acres of Land Near FM 2686 Rio Grande City, Tex.*, 773 F.3d 654, 659 (5th Cir. 2014)), and never addressed *Schlunk* or *Water Splash*. *See Luxottica Grp. S.p.A.*, 391 F. Supp. 3d at 826 n.7 (declining to give *Nagravision* weight because it "does not reconcile its holding with *Schlunk* and *Water Splash*"). As a district court in the Fifth Circuit has recognized, *Nagravision* does not stand for the general proposition that the Hague Convention permits email service on a foreign party. *See Prem Sales, LLC*, 494 F. Supp. 3d at 413. The Fifth Circuit itself appears to have reached the same conclusion. *See Viahart, L.L.C. v. GangPeng*, 2022 WL 445161, at \*3 (5th Cir. Feb. 14, 2022) (invoking *Nagravision* to avoid the question of whether the Hague Convention prohibits service by email).

### B.   Article 15(2) Does Not Permit A Default Judgment Based On Email Service In These Circumstances

Article 15(2) effectively gives the sending State the ability to disregard the Convention and use its own service methods. But that provision has specific requirements that were not satisfied here.

The Convention contemplates two alternative paths for entry of default judgment whenever "a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared." Article 15(1) permits default judgment if service was accomplished through actual delivery by a method provided

for in the Convention or "by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions." As discussed, the SEC's attempted service by email was unauthorized by the Convention or Swiss law.

Article 15(2) permits default judgment when "a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document" and "no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed." Article 6 explains that a "certificate" can attest that "the document has not been served" and "set out the reasons which have prevented service." Accordingly, a certificate stating that service has not been achieved is a "certificate of any kind." Article 15(2) thus authorizes signatories to use alternative means of service when the receiving State has been wholly unresponsive or is refusing to comply with the Convention.

For example, in *Kiss Nail Products, Inc. v. Shenzhen Jinri Electrical Appliance Co.*, the court entered a default judgment when the Chinese Central Authority never responded to plaintiff's service request. 2020 WL 4679631, at *4–5 (E.D.N.Y. July 23, 2020). And in *Facebook, Inc. v. 9 Xiu Network (Shenzen) Technology Co.*, the court recognized that "the Convention doesn't permit the receiving country to refuse service 'on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal

law would not permit the action upon which the application is based.'" 480 F. Supp. 3d at 981 (quoting Art. 13). *See also, e.g.*, Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments) (explaining that courts can turn to Rule 4(f)(3) "when the signatory state was dilatory or refused to cooperate for substantive reasons").

This is not a case where "no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed." Art. 15(2). The Swiss Central Authority was responsive and participated fully in the Commission's attempts to serve Megas in Switzerland. It sent the Commission multiple letters attesting to its attempts to serve Megas in person, explaining why those efforts had not been successful, and informing the SEC about what options were available to it going forward. *See* SA84, JA141-42. On October 19, 2020, the Central Authority sent the Commission a formal letter returning its service request as unexecuted. JA127. Individually or collectively, those communications count as "certificate[s] of any kind" for purposes of Article 15(2). In *Burda Media, Inc. v. Viertel*, 417 F.3d 292 (2d Cir. 2005), for example, the defendant challenged Hague Convention service on the ground that France had returned a police report instead of a formal "certificate." *Id.* at 300–01. The Second Circuit held that the police report qualified as a "certificate." *Id.* at 301. At least one letter from the Swiss Central Authority even uses the word "certificat." *See* SA245.

We recognize that the letters received from the Swiss authorities were not in the certificate form annexed to Article 6. But if the Court concludes that these letters from the Swiss authorities *were not* formal enough to count as "certificate[s]," then this record would not permit a conclusion that the SEC satisfied Article 15(2)'s requirement that "every reasonable effort has been made to obtain [a certificate] through the competent authorities of the State addressed." The letters from the Swiss authorities in the record do not reflect any refusal to supply a more formal certificate or anything else the SEC had asked for. They also contain no statement that the Swiss authorities were done cooperating or that they believed that the SEC had no further options for service. To the contrary, the Cantonal court's August 23, 2021 letter explains that the SEC had "contacted the court by email to ask what options were available under Swiss law to achieve notification of the documents to Thomas Megas," that the court had "proposed sending a memo about the applicable rules," and that (after the SEC's acceptance of that proposal) the memo was "sent on October 8, 2020." JA141-42. That memo is not in the record, but publicly available guidance from the Swiss Federal Office of Justice indicates that "that the Swiss Civil Procedure Code permits the authorities to proceed with a public notice in Switzerland when the address of the addressee is unknown and cannot be ascertained despite making reasonable enquiries or when service is impossible (see Art. 141 CPC)." International Judicial Assistance in Civil Matters, *supra* note 3, at 18.

"[E]very reasonable effort" would at least have required the SEC to follow up on whatever options the Swiss authorities identified.

## III. THE DISTRICT COURT ERRED OR ABUSED ITS DISCRETION IN AUTHORIZING EMAIL SERVICE UNDER RULE 4(F)(3)

Even if Megas's address was "not known" and the Convention did not apply, the district court erred as a matter of law—or, at a minimum, abused its discretion—by jumping to Rule 4(f)(3) without considering whether the Commission had exhausted the possibilities for service under Rules 4(f)(1) and 4(f)(2).

On its face, the structure of Rule 4(f) presents a significant mystery. Subsection 4(f)(1) authorizes service "by any internationally agreed means" reasonably calculated to give notice, such as the Hague Convention. Subsection 4(f)(2) presents several alternatives "if there is no internationally agreed means, or if an international agreement allows but does not specify other means." Subsection 4(f)(3) authorizes service "by other means not prohibited by international agreement, as the court orders." Because the final provision of Rule 4(f)(2)(C)(ii) ends with a semicolon and the word "or," the Rule appears on its face to authorize three disjunctive alternatives. And there is case law from other circuits supporting that conclusion, mostly tracing back to the Ninth Circuit's decision in *Rio Properties, Inc. v. Rio International Interlink*, which held that "Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.'" 284 F.3d 1007, 1015 (9th Cir. 2002) (citation omitted). *See also, e.g., Lexmark Int'l, Inc. v. Ink Tech. Printer Supplies, LLC*, 295

F.R.D. 259, 260 (S.D. Ohio 2013) ("[C]ourts have consistently found that there is not a hierarchy among the subsections of Rule 4(f)."). [9]

Despite the superficial textual support for the *Rio Properties* holding, however, it is not the best reading of the Rule for several reasons.

First, Rules 4(f)(1) and 4(f)(2) clearly provide exclusive rules for non-overlapping situations: 4(f)(1) if an international agreement supplies the required method of service, and 4(f)(2) if no agreement applies or if an agreement applies but fails to specify a method. It would be odd for 4(f)(3) to apply in all circumstances, when the other two provisions have exclusive and carefully limited scopes.

Second, a holding that Rule 4(f)(3) is available in all circumstances would effectively nullify the specific requirements of subsections 4(f)(1) and 4(f)(2). The Supreme Court has held repeatedly that the Hague Convention is mandatory and exclusive within its scope, so we know that 4(f)(3) *is not* available as an alternative when 4(f)(1) applies—at least in cases involving Convention signatories, which will be the vast majority of situations governed by Rule 4(f)(1). *See Schlunk*, 486 U.S. at 705; *Water Splash, Inc.*, 581 U.S. at 273.

Furthermore, all of the alternatives offered by Rule 4(f)(2) explicitly require compliance with the domestic law of the country where service is to be effected.

---

[9] This Court has not addressed how these provisions interact. *See Crockett v. Luitpold Pharmaceuticals, Inc.*, 2020 WL 4039046, at *1 (E.D. Pa. July 17, 2020).

Rule 4(f)(3) is a backstop provision; surely the Rules Committee did not intend for it to render Rule 4(f)(2) and its specific requirements a nullity, or close to it. The general/specific canon addresses this exact problem: When "a general authorization and a more limited, specific authorization exist side-by-side," "[t]he terms of the specific authorization must be complied with" to avoid "the superfluity of a specific provision that is swallowed by a general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("We find the [district court's] reading of [a different provision]—under which clause (iii) permits precisely what clause (ii) proscribes—to be hyperliteral and contrary to common sense.").

Third, the history of the Rule makes clear that it was intended to implement the basic structure of the Convention—and Article 15(2) permits service by extraordinary means only when the receiving State has been unresponsive. Understanding Rule 4(f)(3) to address similar situations would align the Rule with the Convention, and give it a scope independent of Rules 4(f)(1) and 4(f)(2). *See Burda Media, Inc.*, 417 F.3d at 301 (noting that "the Hague Convention should be read together with Rule 4"); *see also Schlunk*, 486 U.S. at 705 ("[W]e do not think that [the United States], or any other country, will draft its internal laws deliberately so as to circumvent the Convention . . . .").

The 1993 Amendments replaced the former subdivision (i) with the current subdivision (f). *See* Fed. R. Civ. P. 4 (advisory committee notes to the 1993

amendments). The Advisory Committee notes make clear that Rule 4(f)'s three-part structure was drafted with the Hague Convention in mind and that subsection 4(f)(3) primarily implements Article 15(2), which "provide[s] that alternate methods may be used if a Central Authority does not respond within six months." *See* Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments). In such cases, typically "when the signatory state was dilatory or refused to cooperate for substantive reasons . . . resort may be had *to the provision set forth in subdivision (f)(3)*." *Id.* (emphasis added). Put differently, the Advisory Committee saw Rule 4(f)(3) as a "safety valve for unanticipated situations," not an alternative option of first resort. 4B Charles A. Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* § 1133 (4th ed. April 2020 update).

The parallel between Article 15(2) and Rule 4(f)(3) makes sense of why Rule 4(f)(3), unlike Rule 4(f)(2), does not require compliance with foreign law. Where the Convention applies but a country's Central Authority is not cooperating, Rule 4(f)(2) does not apply by its terms. A federal district court also can invoke Rule 4(f)(3) to authorize alternative service methods that may violate the receiving State's internal law, without violating the Convention. *See Rio Properties*, 284 F.3d at 1014 (noting that court-ordered service under Rule 4(f)(3) "may be accomplished in contravention of the laws of the foreign country"). For example, district courts have used Rule 4(f)(3) to authorize email service on Russian defendants because Russia, despite

being a signatory to the Convention, has refused for the past decade to cooperate with American requests for service through its Central Authority. *See, e.g.*, *ShelterZoom Corp. v. Goroshevsky*, 2020 WL 4252722, at *1 (S.D.N.Y. July 23, 2020). As noted previously, in the litigation that produced the Fifth Circuit's decision in *Nagravision* the Chinese Central Authority was wholly unresponsive. Understood that way, Rule 4(f)(3) is not a license for ignoring Rules 4(f)(1) and (f)(2) simply because the requirements of those provisions are inconvenient. Rule 4(f)(3) instead authorizes extraordinary means as "a final effort to make service when other means have failed" due to the foreign State's total failure or refusal to comply with its treaty obligations. *Marcantonio v. Primorsk Shipping Corp.*, 206 F. Supp. 2d 54, 58 (D. Mass. 2002).

To the extent there is doubt about that, it should be resolved by concerns about international comity. It has been a truism of statutory interpretation since Chief Justice Marshall's decision in *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804), that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." An understanding of Rule 4(f) that would essentially make compliance with foreign law and United States treaty obligations optional in all circumstances is an obvious affront to principles of comity.

Even if the Court concludes that the text will not support strictly limiting Rule 4(f)(3) to situations involving treaty non-compliance satisfying Article 15(2), the Rule clearly requires an exercise of discretion by the district court. The Advisory Committee recognized subsection (f)(3)'s potential for abuse, highlighting that it should be invoked in ways that "minimize[] offense to foreign law." Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments). "[B]y turning immediately to Rule 4(f)(3) . . . judges elevate concrete case management concerns over the systemic comity interests embodied in the [Hague] Service Convention." Gardner, *supra*, at 1002.

Serving a Swiss resident in a manner consistent with Swiss law may be inconvenient for the SEC, but surely it is not impossible or there would be no enforcement of private rights in Switzerland. The Swiss court's August 23, 2021 letter to the SEC makes clear that it sent the SEC a memorandum outlining the available options for serving Mr. Megas consistent with Swiss law. JA141-42. The district court made no finding that whatever options were outlined in that memorandum were unrealistic or unavailable. We also do not know how the Swiss authorities would have responded to a renewed request for service under the Convention—including a wholly new request if the SEC's complaint was dismissed without prejudice and re-filed. It was, at least, an abuse of discretion for the district court to leap to Rule 4(f)(3) without careful consideration of the available

alternatives and the international comity implications of circumventing the Convention and the limitations on Rule 4(f)(2).

## IV. SERVICE VIA MEGAS'S HOTMAIL ACCOUNT WAS NOT REASONABLY CALCULATED TO PROVIDE NOTICE

The manner in which the Commission served Megas also was not "reasonably calculated . . . to apprise" Megas of the lawsuit when compared to available alternatives. *Espinosa*, 559 U.S. at 272 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

To satisfy due process "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," and must not be "substantially less likely to bring home notice than other of the feasible and customary substitutes." *Mullane*, 339 U.S. at 315. Due process permits service by publication or other unconventional alternatives "where it is not reasonably possible or practicable to give more adequate warning." *Id.* at 317. But it does not permit a plaintiff to deliberately choose a method of service less likely to inform the defendant than other available alternatives, simply because the better and more traditional alternatives are inconvenient. As the Supreme Court has counseled, "[e]xceptions in the name of necessity do not sweep away the rule that within the limits of practicability notice must be such as is reasonably calculated to reach interested parties." *Id.* at 318.

The Commission knew Mr. Megas's address in Switzerland and had that address repeatedly confirmed by both Swiss and American authorities. Doubtless it was frustrating that the Swiss authorities failed in several attempts to personally serve him at that address. But that failure does not show that personal service was impossible or even impractical, particularly given the unique world circumstances in 2020 and early 2021. Again, the current record would not support a conclusion that the SEC had no options for personal service consistent with Swiss law.

Mr. Megas also pointed out below that the Commission had evidence that he sent scores of emails regularly from his Swiss-based emails, and that the Hotmail address was essentially dormant. The Commission responded that it chose the Hotmail account not because it would provide the best opportunity to reach Mr. Megas, but because it was hosted on a U.S.-based server and the Commission was concerned about violating Swiss law. In fact, the SEC acknowledges that it was unaware of any email sent from that account since October 30, 2018, nearly two years prior. JA85. But due process required the Commission to choose the method most likely to actually inform Mr. Megas of this litigation. It relies on *SEC v. Vuuzle Media Corp.*, 2021 WL 1731947 (D.N.J. May 3, 2021), where the court held that the "SEC's inability to obtain a definitive physical address" for the defendant allowed service "via an email address believed to be actively used by [the defendant]." *Id.* at *1. But the email at which the defendant was served in that case was his "primary

email." *Id.* Here the SEC chose to serve Megas at an email address they knew to be rarely if ever used, apparently prioritizing its own concerns about Swiss law over the choice of means most reasonably calculated to reach Mr. Megas.

Perhaps in an appropriate case the Court would have to grapple with whether a foreign legal prohibition can render the means most likely to inform a defendant "unavailable" for due process purposes. But that argument rings particularly hollow in this case, where actual personal service may well have been possible and consistent with Swiss law and the United States's treaty commitments. Indeed, the Commission's concerns about running afoul of Swiss law are inconsistent with its core contention that email service was permissible because Mr. Megas no longer has a "known" address in Switzerland or any physical presence there. This Court should not allow the Commission to claim simultaneously that email service was proper because it does not know where Mr. Megas lives, but that the Commission was entitled to use a dormant email account because contacting his regular email address would violate Swiss law.

## V. THE DISTRICT COURT ERRED AND ABUSED ITS DISCRETION BY BLAMING MR. MEGAS FOR NOT VOLUNTARILY ACCEPTING SERVICE OR APPEARING IN THIS LITIGATION

The district court also erred and abused its discretion when it blamed Mr. Megas for "willfully avoid[ing] timely action in this matter," JA39, or "sleep[ing] on his rights," JA43. "A default judgment entered when there has been no proper

service of the complaint is, *a fortiori*, void, and should be set aside." *Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir. 1985). Equitable factors like the ones this Court outlined in its *Feliciano* decision are relevant "only when the default judgment was authorized and the only question before the district court is whether to exercise its discretion to set aside the default." *Id.* (citing *Feliciano*, 691 F.2d at 656). The SEC appears to concede that point. *See* Dkt. 16, at 31 n.5.

But even if the equities were relevant, Mr. Megas should not be punished for insisting that service be effected as the United States's treaty obligations require. He is not a resident of this country and the SEC is attempting to pull him into burdensome litigation thousands of miles from his home. Mr. Megas was not sleeping on his rights by failing to volunteer for litigation in a foreign country; he was standing on his "right to insist on service pursuant to the Hague Convention." *Sheets*, 891 F.2d at 536. The Convention exists precisely to standardize service in these types of situations. And it was not Mr. Megas's burden to spare the SEC from what the Hague Convention requires. This Court should hold the Commission to its legal obligations.

At a minimum, the default judgment should be set aside and Mr. Megas should be given an opportunity to defend himself on the merits. Mr. Megas responded to the default judgment very promptly, and the district court recognized that the SEC would not be prejudiced in any way if the default judgment were set aside. This Court's

precedents properly reflect a strong preference that cases should be decided on the merits rather than by default. *E.g.*, *Tozer*, 189 F.2d at 245. A case in which the propriety of international service of process raised legal issues this complex, and in which the defendant appeared promptly to contest the validity of default judgment, seems an appropriate occasion to apply that longstanding principle.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order denying Mr. Megas's motion to vacate the default judgment.

Respectfully submitted,

*/s/ J. Scott Ballenger*

J. Scott Ballenger
Ben Buell (Third Year Law Student)
Jon Duval (Third Year Law Student)

UNIVERSITY OF VIRGINIA
SCHOOL OF LAW
Appellate Litigation Clinic
580 Massie Road
Charlottesville, VA 22903
(434) 924-7582
sballenger@law.virginia.edu

*Amicus Curiae Supporting Appellant*

# CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Appellate Rule 46.1(e), the undersigned hereby certifies that he is counsel of record and is a member of the bar of the United States Court of Appeals for the Third Circuit.

December 29, 2023

/s/ J. Scott Ballenger
J. Scott Ballenger
*Amicus Curiae Supporting Appellant*

# CERTIFICATE OF COMPLIANCE WITH THE TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains <u>12,136</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

II.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman.

December 29, 2023                    <u>*/s/ J. Scott Ballenger*</u>
                                     J. Scott Ballenger
                                     *Amicus Curiae Supporting Appellant*

**CERTIFICATE OF SERVICE**

I, J. Scott Ballenger, hereby certify that on December 29, 2023, I caused seven (7) copies of *Amicus Curiae*'s Opening Brief Supporting Appellant and four (4) copies of Appendix Volume II to be dispatched by FedEx delivery to the Clerk of the Court for the United States Court of Appeals for the Third Circuit, and filed an electronic copy of the brief via CM/ECF. I also caused a copy of this brief to be served electronically on the following counsel for Appellee:

Stephen Silverman
Jeffrey A. Berger
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

*/s/ J. Scott Ballenger*
J. Scott Ballenger
*Amicus Curiae Supporting Appellant*

# CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF

I, J. Scott Ballenger, hereby certify that the text of the electronically filed brief is identical to the text of the original copies that were dispatched on December 29, 2023, by FedEx delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

/s/ J. Scott Ballenger
J. Scott Ballenger
*Amicus Curiae Supporting Appellant*

**CERTIFICATE OF PERFORMANCE OF VIRUS CHECK**

I, J. Scott Ballenger, hereby certify that on December 29, 2023, I caused a virus check to be performed on the electronically filed copy of this brief using the following virus software: Vipre Virus Protection, EndpointSecurity, version 11.0.7633. No virus was detected.

*/s/ J. Scott Ballenger*
J. Scott Ballenger
*Amicus Curiae Supporting Appellant*

# IN THE

# United States Court of Appeals
## FOR THE THIRD CIRCUIT

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

THOMAS MEGAS,

*Defendant-Appellant,*

and

TODD LAHR,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**APPENDIX VOLUME I OF II (Pages 1 - 44)**

J. Scott Ballenger
Ben Buell (Third Year Law Student)
Jonathan Duvall (Third Year Law Student)
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
Appellate Litigation Clinic
580 Massie Road
Charlottesville, VA 22903
202-701-4925
sballenger@law.virginia.edu

*Court Appointed Amicus Curiae Counsel Supporting Appellant*

# TABLE OF CONTENTS

## VOLUME I OF II (*attached to Opening Brief*)

Appendix Page

Notice of Appeal
2022.08.12 [ECF62] ................................................................................... 1

Notice of Appeal
2022.08.19 [ECF64] ................................................................................... 2

Memorandum Opinion
2022.07.20 [ECF60] ................................................................................. 29

Order
2022.07.20 [ECF61] ................................................................................. 44


## VOLUME II OF II (*filed separately*)

District Court Docket [5:20-cv-01593-EGS]........................................................45

Complaint
2020.03.23 [ECF1] .................................................................................. 54

Attachment to Plaintiff's Motion for an
Extension of Time to Serve Defendant Thomas Megas
2020.06.18 [ECF8]:

    Att. 2:    Scarlato Declaration dated June 18, 2020 (First) [ECF8-2] ......... 80

Attachments to Plaintiff's Motion to Authorize Alternative
Service, Or, Alternatively, to Grant an Extension of Time to
Serve Defendant Thomas Megas
2020.12.14 [ECF15]:

    Att. 2:    Scarlato Declaration dated Dec. 14, 2020 (Third) [ECF15-2]...... 82

i

Excerpts of Exhibits 1 - 11 [ECF15-3]:

    Ex. 1:    Hague Convention Service Request ........................................ 87

    Ex. 4:    Oct. 23, 2020 FINMA Response to SEC's
                 Request for Information on Megas ........................................ 91

Attachment to Plaintiff's Motion for Default
Judgment Against Defendant Thomas Megas
   2021.07.20 [ECF24]:

    Excerpts of Exhibits 1 - 7 [ECF24-3]:

    Ex. 4:    SEC Email to Megas ................................................................. 96

    Ex. 6:    RPost Reply to SEC Email ....................................................... 98

Defendant Thomas Megas Motion the Court to Dismiss the
Default Judgment Against Him Entered on 30th July 2021
   2021.08.05 [ECF29] .......................................................................... 100

Order (Plaintiff's Response and Motion Hearing)
   2021.08.10 [ECF30] .......................................................................... 113

Request to Reconsider Denial of Request for Telephone/Video
Hearing for Hearing Scheduled for Sept. 10, 2021 Consider Motion
to Dismiss Default Judgment Against Thomas Megas on July 30, 2021
and to Cite Explanation for Requesting a Physical Hearing
   2021.08.18 [ECF31] .......................................................................... 114

Exhibits to Plaintiff's Opposition to Defendant
Thomas Megas' Motion to Dismiss the Default Judgment
   2021.08.24 [ECF32]:

    Ex. 1:    Apr. 27, 2020 Letter from the Swiss Authorities
                 Concerning the Commission's Hague Convention Request
                 [ECF32-2] ............................................................................. 121

Ex. 3:     Oct. 19, 2020, Letter from The Swiss Authorities
Returned the Commission's Hague Convention Request
Unserved [ECF32-4] ................................................................... 127

Ex. 5:     List of Companies Obtained by Searching Megas'
Name in The United Kingdom Companies House
Database [ECF32-6] ................................................................... 128

Ex. 6:     Oct. 27, 2020, Email Sent Megas at Known Email
Address [ECF32-7] ..................................................................... 130

Ex. 7:     RPost Proof of Delivery of Oct. 27, 2020 Email to
Megas [ECF32-8] ........................................................................ 131

Ex. 9:     RPost Proof of Delivery of Feb. 10, 2021 Email
to Megas [ECF32-10] .................................................................. 133

Ex. 11:    Email Automated Response sent to Inactive
Hotmail Account re: Feb. 10, 2021 email [ECF32-12] .............. 135

Ex. 12:    July 20, 2021 Email Automated Response from
Inactive Hotmail Account re: Motion for Default
Judgment [ECF32-13] ................................................................. 137

Ex. 13:    July 21, 2021 Email Automated Response from
Inactive Hotmail Account re Hearing [ECF32-14] ..................... 139

Exhibit to Plaintiff's Supplemental Filing in Opposition to
Defendant Thomas Megas' Motion to Dismiss the Default Judgment
    2021.08.30 [ECF34]:

Ex. 16:    Aug. 23, 2021 Letter from Swiss District Judge [ECF34-3] ....... 141

Order (Denying Telephonic Hearing)
    2021.09.03 [ECF36] ..................................................................... 147

Order (Rescheduling Hearing)
    2021.09.09 [ECF40] ..................................................................... 148

Order (Denying Telephonic Hearing)
   2021.10.19 [ECF43] ................................................................ 149

Order (Rescheduled Telephonic Hearing)
   2021.10.29 [ECF47] ................................................................ 150

Order (Supplemental Briefs and Telephonic Hearing)
   2021.11.12 [ECF51] ................................................................ 151

Plaintiff's Response in Opposition to Defendant
Thomas Megas' Supplemental Brief
   2022.01.10 [ECF57] ................................................................ 152

Attachment to Plaintiff's Motion for Default
Judgment Against Defendant Thomas Megas
   2021.07.20 [ECF24]:

      Att. 2:    Scarlato Declaration dated July 20, 2020 (Second)
           [ECF24-2].................................................................160

Case 5:20-cv-01593-EGS Document 60   Filed 07/20/22  filed 12 August 2022  *Page 1 of 1*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


SECURITIES AND EXCHANGE      :
COMMISSION,                  :
                             :
          PLAINTIFF,         :          CIVIL ACTION NO. 20-1593
                             :
     V.                      :
                             :
     THOMAS MEGAS  :
                             :
     DEFENDANT.   :


NOTICE OF APPEAL


THIS IS TO SERVE NOTICE TO THE COURT THAT I WILL  SHORTLY FILE AN APPEAL  FOR
CONSIDERATION  BY THE THIRD CIRCUIT APPEAL COURT TO DISMISS THE DECISION
REACHED BY THE COURT ON 20 JULY 2022.


DATED 12 AUGUST 2022                          RESPECTFULLY SUBMITTED

                                              *T. Megas*

                                              THOMAS MEGAS PRO SE

## IN THE THIRD CIRCUIT APPEAL COURT UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE  :
COMMISSION  :
  :
PLAINTIFF  :
                   CASE 5 : 20-CV-01593-EGS

V

THOMAS MEGAS

DEFENDANT (PRO SE)

APPEAL BY THOMAS MEGAS (PRO SE)

TO DISMISS THE DECISION REACHED IN THE CASE 5: 20-CV-0159-EGS

OF THE SECURITIES EXCHANGE COMMISSION V TODD LAHR AND

THOMAS MEGAS  REACHED BY THE  EASTERN DISTICT COURT ON 20 JULY 2022

## INDEX

| | |
|---|---|
| 1 - Introduction | Page 2 |
| 2 – Brief Facts | Page 2 |
| 3. The Hague Convention | Page 5 |
| 4. The Honorable Edward G. Smith displayed personal bias or prejudice against Megas | Page 6 |
| 5. Fractural And Procedural History According to The Judge In His Memorandum Dismissing The Request To Set Aside The Default Judge | Page 7 |
| 6. The Court Can And Should Have Granted The Motion To Set Aside The Default Judgement | Page 14 |
| 7. Rule 60(B) Motion Generally | Page 15 |
| 8. Misrepresentation or Misconduct Under Rule 60(b)(3) | Page 16 |
| 9. Void judgement Under Rule 60(b)(4) | Page 18 |

1

9. CONCLUSION

## 1. Introduction

1.1. The petitioner Thomas Megas (Megas. Appellant, Defendant Me I ) seeks to appeal a default judgement made against him by the Honorable Edward G Smith which is unenforceable in Switzerland and thus moot because

   i)   Megas has not been effectively served with process, R & R adopted by U.S. List. LEX 42483 (March 28, 2014); and article 5 of the Hague Conventions.

   ii)   Contrary to 28 U.S. Code § 144. The Honorable Edward G. Smith who was presiding over this matter displayed personal bias or prejudice against Megas and in favour of the plaintiff (The SEC), and allowed the Plaintiff to try to serve Megas at old addresses by post and email despite knowing that Megas is a Swiss resident and that service of process in Switzerland can only be done personally by the police under article 5 of the Hague convention and this was not done.

   iii)   When Megas eventually found out about the proceedings his attempts to obtain justice were actually obstructed by the judge who, as will be explained later, made what can only be described as a number of bizarre, illogical and prejudicial decisions against Megas.  It was only after Megas complained in writing to the Chief Judge of Eastern Pennsylvania, Juan R Sanchez did the Honorable Edward G Smith act more reasonably.

   iv)   As a result of the conduct described above, Megas was denied his right under FRCP 38 to trial by jury, which had been requested by the Plaintiff.

## 2. Brief Facts.



2

PAGE 3 OF 27            18 AUGUST 2022

2.1. Megas has been, and remains a Swiss resident since 2003 and holds a current Swiss C residents permit **(EXHIBIT 1- Megas Swiss Permits).**

2.2. On 23 March 2020 The SEC filed a claim against Megas and another defendant Lahr. **(EXHIBIT 2 – SEC Filing)**. Mr Lahr, who is believed to have been operating as an SEC informant, was dealt with and disposed of by The Honorable Edward G Smith.

2.3. In their claim, the SEC stated that Megas resides in Switzerland and the Honorable Edward G Smith acknowledge and directed that pursuant to Federal Rules of Civil Procedure for (FRCP) 4(f)(1), (h)(2) directed that Megas be served in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, to which Switzerland is a signatory. Consequently, The SEC had the papers translated and sent to Switzerland to be personally served by the Swiss police in accordance with Article 5 of the Hague Convention ( "The Convention") just as the Coronavirus pandemic was starting to make itself felt and the world, including Switzerland and the USA all went into lockdown and closed their borders.

2.4. Megas was aware that the Swiss police were trying to contact him but did not know why and actually attended the police station. While he was handed a summons for a minor social matter he was not served with the documents from this case.

2.5. In a letter dated 27 APRIL 2020, the Swiss authorities informed the SEC that the Swiss police confirmed to the court that Mr Megas was legally domiciled at the address in Switzerland and that the SEC had on record stated as fact in their statement of claim and at the start of the proceedings, **(EXHIBIT 3 Letter of Swiss Police)** but for some reason and despite Megas going to the Police Station, service was not made. **(EXHIBIT 4 - Proof of attendance at the police station)**

3

Case 5 : 20-cv-01593-EGS        PAGE 4 OF 27        18 AUGUST 2022

2.6. The SEC applied for, and was granted, further time to serve, but as has already been stated this was during the covid pandemic and although Megas was at home the police did not serve him.

2.7. On 19 October 2020, the Swiss authorities sent the SEC a letter formally returning its Hague Convention service request as unexecuted and there then followed a number of bad filings by the SEC seeking alternative methods of service, which on their own amounted to an abuse of process and which can only be described as a series of bizarre, biased and ultimately fatally flawed procedural decisions by the judge.

2.8. 17 December 2020 the court allowed the SEC to try to serve Megas at historical addresses in the United Kingdom, and what the SEC did was to send them by post, they did not go through the Hague Convention process or seek to have the matter domesticated in the UK as they are required to do so even if Megas had received these letters he still would not have been served because the Hague Convention was not adhered to.

2.9. Any service of judicial documents in the UK need to comply with local service rules which are set out in Part 6 of the English Civil Procedure Rules 1998 (CPR 6) ( **Exhibit** 5 – **UK CPR 6**) which deals with service of documents from foreign courts or tribunals, governs the service in England and Wales of any `any document ` in connection with foreign civil or commercial proceedings: this includes judicial documents as referred to in the Hague Convention.

2.10. The SEC should have made a written request for service via the US Embassy to the UK court via the Foreign and Commonwealth Office. This would then be passed to the High Court who would determine service. In short the SEC and the Honorable G Smith of the District Court Eastern Pennsylvania cannot just serve a resident British Citizen directly, they have to go through the process as laid down in the Hague Conventions and that was not done.

4

PAGE 5 OF 27          18 AUGUST 2022

2.11. The application to serve by post and email was an abuse of process and should not have been allowed because a) by this stage all the matters were out of time   b) it was a pivotal part of the SEC claim that Megas was a Swiss resident and  c) the Swiss police confirmed in writing to the court that Megas is legally domiciled at the address in Switzerland.  Even if Megas had been resident in the UK the process adopted by the SEC and rubber stamped by the court was illegal.

2.12. The court also allowed the SEC permission to serve by email.  Had Megas been resident in the UK and the SEC had gone through the Hague Convention protocol then that would have been permitted under Article 8 - 10 of the Hague Convention which allows for alternative methods of service provided that the country receiving the request agrees, but Switzerland does not agree to article 8 - 10 and does not permit service by mail  or email.

**2.13.** The US Department of Justice and the US Embassy in Switzerland states that service by post or email is not allowed and the Embassy warns that such service is actually a criminal offence in Switzerland. The Defendant pointed out to the court that this service of Swiss residents is not permitted in Switzerland but the court simply ignored this **(EXHIBIT 6 & 7 – service in Switzerland).** The US Marshalls Office also says this is not permitted.

https://www.usmarshals.gov/what-we-do/service-of-process/civil-process/hague-convention-service-abroad

### 3.  THE HAGUE CONVENTION

**1.** It is a well settled proposition that the Hague Convention preempts any inconsistent methods of service prescribed by Texas law in all cases where the Convention applies.  The Hague Convention applies in all civil and commercial matters where "there is occasion to transmit a judicial or extra judicial document for service abroad". Convention on the Service Abroad of



Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 1. The Convention, therefore, applied to Water Splash's attempt to serve Menon.

2. Articles 2 through 7 of the Convention require signatory nations to establish a "Central Authority" to act as an agent to handle requests for service, service of documents, and proof of service.Id. arts 2-7.

3. Article 10 of the Convention, however , lists certain actions that the "Convention shall not interfere with,"  including section (a): "the freedom to send judicial documents, by postal channels, directly to persons abroad." Id. at art. 10

4. Article 10 Alternative methods of service may be available through the subject country's Central Authority, directly through diplomatic channels, provided the state of destination does not object, directly through judicial officers, officials or other competent persons of the state of destination.

5. If the state of destination does object then it cannot be used. See page 4 of the U.S. Department of Justice Guide to Service Abroad under the Hague Convention.

## 2.  The Honorable Edward G. Smith displayed personal bias or prejudice against Megas

2.1.Megas was aware that the local police had been to his address but that is not the same as knowing there were legal proceedings against him or that the Swiss police were trying to serve him and despite attending the police station to find out what the police wanted he was not served and so did not know that he was subject to the claim and so did not respond to the complaint.

2.2.Megas has made it very clear to the judge that had he known of the case he would have responded and strenuously denied the allegations.

6

**7**

2.3. When he did find out about the case he contacted the court and found a default judgement had been entered against him and immediately filed a motion to dismiss/set aside the default judgement because he had not been served in accordance with FRCP 4(f)(1), (h)(2) and Article 5 of the Hague Convention.

2.4. Having filed his request, Megas was then ordered by the Honorable Edward G Smith to appear in person before the court at a hearing. It was actually physically and legally impossible to comply with the judge's order because the US borders were shut due to covid and any attempt to travel and enter the US would have been illegal. As it is, quite how the judge thought Megas could have got there is a mystery because there were no flights to the US because the borders were closed. The there is the question of whether the judge could actually order Megas to attend, because Megas had not been served.

2.5. Even if the border had been open, who was going to pay for the travel and accommodation from Europe to USA?  Last but not least Megas is 79 and told the judge at the very start he was unable to fly due to a health issues, and provided a letter from his doctor which the judge ignored.

2.6. Twice Megas raised these issues with the judge and requested a telephone hearing and twice the judge denied his request, despite the fact that it was contrary to the Eastern Pennsylvania courts -Covid rules and policy  **(EXHIBIT 8 - Court Rules re Covid.)**

2.7. The Judge's conduct was not only unfair it was illogical and he was making orders that simply could not be complied with.

2.8. It was only when Megas wrote to the Chief Judge Juan R Sanchez  did the Honorable Edward G Smith relent on the matter of physical attendance. **(EXHIBIT 9 - Letter To Judge Juan R Sanchez.)**

7

**8**

Case 5 : 20-cv-01593-EGS     PAGE 8 OF 27          18 AUGUST 2022

2.9. Megas denies all the allegations in the SEC complaint and asserts that the allegations are not plausible on their face and that evidence submitted by the SEC in their claim giving details of transactions from his personal bank account were obtained illegally and without warrants or court orders.

2.10. Megas told the Judge that if the default was set aside and the SEC filed with the court to serve again he would accept service and contest the case on its merits. Megas is not surprised that the judge denied the request because he knows the case is weak evidentially.

## 3. Fractural And Procedural History According to The Judge In His Memorandum Dismissing The Request To Set Aside The Default Judge.

3.1. There are a number of inaccuracies with the judge's take on the procedural history.

3.2. The judge said "As for the SEC's claims against Megas, because it is believed that Megas resided in Switzerland the SEC first attempted to serve him by issuing a request to the Swiss authorities under the Hague Convention for Service Abroad of Judicial or Extrajudicial Documents in Civil or Commercial Matters ( " Hague Convention "). The SEC stated as fact in their claim that Megas is a Swiss resident. If this is not correct then it follows that other parts of the SEC claim are not correct.

3.3. The judge says that their attempt at his last known address was unsuccessful. Id, Ex.. 1, Doc. No. 32-2; see also id, at 4 (describing letter). But then goes on to say that The Swiss authorities attached a police report to this letter, which confirmed Mr Megas was legally domiciled at the address but would be abroad until late August 2020. Id.Ex, 2, Doc, No. 32-3.



8

**9**

PAGE 9 OF 27          18 AUGUST 2022

3.4. If it had been the last known address the police would have said that, but they did not. The judge says that the Swiss police confirmed Mr Megas was legally domiciled at the address. As the police confirmed Megas lived at that address then it was right to try and serve him personally.

3.5. The report stated Mr Megas did " not want to receive anything between now and then and that he would follow up with us upon his return to Switzerland. " That does not make sense, the police clearly spoke to somebody but there are no details as to who and surely the court and or the SEC should have asked the Swiss police for clarity Id. Given this information, the Swiss authorities indicated they would attempt to serve Megas again in September 2020. Id. Ex. 1.

3.6. The world was in lockdown and the Swiss lockdown was very strict, Megas was at home and admits that he knew the police had called but did not know what for and so he went to the police station but was not served.

3.7. On May 26, 2020, this court provided notice to the SEC that it had until June 23, 2020, to serve Mr Megas or face dismissal without prejudice in accordance with Rule 4(m) of the Federal Rules of Procedure. Doc. No. 5.

3.8. On June 18, 2020, the SEC timely moved for an extension until October 15, 2020, to serve Mr Megas, Doc. No. 8 which this court granted after finding that the plaintiffs established good cause for the requested extension. Doc. No. 9. This extension was not really justified, the world was in lockdown and the Swiss lockdown was very strict, Megas was at home.

3.9. The judge says that as promised, the Swiss authorities made several efforts to contact Mr Megas via telephone and to effect service on him at his known address in

3.10. September 2020. Scarlet Decl, at 5. Those efforts, as well as a final attempt on October 11, 2020 were unsuccessful. Id at  5-7. It is hard to avoid the police in Switzerland and even

9

10

harder during the lockdown and Megas does not know why the police did not serve him but he was at home.

3.11. On October 19, 2020, the Swiss authorities sent the SEC a letter formally returning its Hague Convention service request as unexecuted. Id. Ex. 3, Doc No. 32-4. This means that any further effort to serve Megas in Switzerland would have to be resubmitted through the appropriate channels.

3.12. Because the SEC was unable to serve Mr Megas, it timely filed a motion on 15 October 2020, seeking another extension until December 14, 2020, to locate and serve Mr Megas. Doc. No. 13. The judge granted the SEC 's motion and extended the time for it to serve to 14 December 2020. Doc No. 14. Despite the fact that the case had now been before the court for seven months during the covid lockdown and the police had confirmed that the address the SEC had was the correct address. How long can the court give? These matters were old at the end of their time under the statute of limitations.

3.13. The court had already warned the SEC on May 26, 2020, when granting an extension that they had until 23 June 2020, to serve Mr Megas or face dismissal without prejudice in accordance with Rule 4(m). When it came to it in June the court allowed the SEC more time which was a borderline decision. This extension in December was not justified and should not have been permitted.

3.14. The judge states that during this time the SEC contacted their counterpart in Switzerland the Swiss Financial Market  Supervisory Authority ( "FINMA "), for Mr Megas 's travel records, known telephone numbers and email addresses, and any other information that might help the SEC determine Mr Megas 's location.

3.15. Scarlet at 9. FINMA was unable to confirm or deny Mr Megas 's whereabouts and stated it did not have the authority to request Mr Megas 's travel records. Id EX. 4, Doc. No 32- see

10



PAGE 11 OF 27                    18 AUGUST 2022

also id at /9. The Swiss police had already confirmed in April 2020 that he was legally domiciled at the address on record, so this is the judge trying to help the SEC make a case for the SEC for another extension while they tried to pull another plan out of the bag.

3.16. The judge says that The SEC also requested Mr Megas `s travel records from the United States Department of Homeland Security ( "DHS" ), searched DHS data bases and contacted Mr Megas `s known United States contacts, including Mr Lahr, Id. at / 10. These efforts did not produce useful information. Id.  That was not made public, but maybe that is because the DHS records would show that Megas did not travel to Pennsylvania and had not been in the USA since 2015.

3.17. The judge goes on to say that after conducting public internet searches, however, the SEC finally uncovered relevant material, namely that Mr Megas was listed as a current or former director of four companies in the United Kingdom. Id at /11 and Ex. 5, Doc. No 32-6.  These records listed several addresses in the United Kingdom Id. at 11 and Ex. 5.  The SEC were on a fishing trip now. They had already told the court in their claim that Megas is a Swiss resident and this had been confirmed by the Swiss police. A bit of basic internet research would have shown that the addresses were not residential addresses, but this is where the SEC and more importantly the court appear to finally ignore the Federal Rules of Civil Procedure, The Hague Convention, Swiss and UK Law, and rules of civil procedure.

3.18. The judge says that the SEC made further progress on October 27, 2020, when counsel for the SEC emailed Mr Megas at his known email address tpm14@hotmail.com. Id at /13 and Ex. 6, Doc. No 32-.  This is materially false and misleading and the judge does not say that Megas had addressed this and told the judge, he had given the SEC several email addresses and this was not his current email address. The judge goes on to say that in sending the email, the SEC used a technology platform called RPost that provides proof of delivery and

11



read receipts if the recipient opens the email. Id. a / 14. R. Post confirmed the email to Mr Megas was delivered successfully. Id. at / 14 and Ex, 7, Doc. No. 32-8; see also id. at / 15 ( " After sending the October 27, 2020 email to Megas, I did not receive a return message that the email was returned and undelivered " ). Email address. Doc. No 15. This is a moot point because a) there is no evidence that Megas read it and b ) it is not permissible to serve a Swiss resident by email or post. Furthermore, the Hague Convention request had expired and had been returned by the Swiss Police.

3.19. Yet again the court granted the motion on December 17, 2020, and extended the time for the SEC to serve Mr Megas until 28 May 2021, Doc No.18.

3.20. The judge says that in January 2021, the SEC unsuccessfully attempted to serve Mr Megas in the United Kingdom, and there was no indication he resided at any of the United Kingdom addresses Scarlet Dec. at / 16. Even if Mr Megas had lived in the UK the service would not be valid because it was not done through the Hague Convention and service was not done in compliance with section 6 of the UK rules.

3.21. The judge says that the SEC served Mr Megas with the summons and complaint a his known email address, tpm14@hotmail.com and it received an RPost confirmation that the email was delivered Id. at // 17, 18, and Exs. 8-9, Doc. Nos 32-9, 32-10. Shortly after sending the email, the SEC received an automated reply stating, "it had not been possible to deliver your message" to tpm14@hotmail.com as the account does not appear to be in use " Id at / 19 and Ex. 10, Doc. No 32-11. Notably the SEC did not receive this reply after its October 27, 2020 email to the same account. This is moot, because as has been explained a) The Hague Convention request of the Swiss had been returned and not renewed and b) even if there was a Hague Convention request, Switzerland does not permit alternative service under article 8-10 and what the court allowed the SEC to do was illegal.

12

3.22. Despite Megas not having being served in any shape or form, on "9 April, 2021, the SEC submitted a request for default against Mr Megas pursuant to Rule 55 (a) of the Federal Rules of Civil Procedure, Doc. No 22,, and the Clerk of Court entered default against Mr Megas later that day. See Unnumbered Docket Entries Between Docs. No 22 and 23. The SEC then filed a motion for default judgement on 20 July 2021. Doc. No. 24.

3.23. It attempted to serve Mr Megas with this motion via email but received a response from Hotmail indicating the account had been deactivated. Scarlet Decl. at /21 and Ex. 12, Doc. No 32-13. Again this is a moot point for the reasons stated with regards to the Swiss not permitting this type of service.

3.24. On 21 July, 2021, this court scheduled a July 30, 2021 hearing on the SEC 's motion for default judgement. Doc. No.25. Again counsel for the SEC attempted to serve Mr Megas with this order at his email address but received a response from Hotmail that the account had been deactivated. Scalato Dec. at / 22 and Ex. 13, Doc. No 32-14.

3.25. On July 30, 2021, this court held a hearing on the SEC 's motion for a default judgement. Mr Megas did not participate or otherwise contact the SEC or this court by the time of the hearing. Id. at / 24. At the conclusion of the hearing, the court granted the motion and issued a default judgement against Mr Megas, Doc. 27. Of course Mr Megas did not participate because he had not been served and did not know about it.

3.26. Several days later, Mr Megas filed a motion to dismiss the default judgement. Doc No. 29 . On August 10, 2021, the court entered an order setting a response date for the SEC and scheduling an in-person hearing on this motion for September 10, 2021. Doc. No. 30. Why did the judge order an in person hearing? All the hearings to date had been by telephone in line with the courts covid policy so why order an old man living outside the USA to travel 4200 miles for a court hearing in the middle of a world pandemic?

Case 5 : 20-cv-01593-EGS

3.27. On 18 August 2021, Mr. Megas requested that the court hold the hearing telephonically. Doc. No. 31. The SEC filed a response in opposition to the motion to dismiss the default judgement on August 24, 2021. Doc. No 32. Mr Megas filed a reply on August 29, 2021. Doc, No 33. One day later, on August 30, 2021, the SEC submitted a supplemental filing in opposition to the motion. Doc. No. 34. Mr Megas responded the following day . Doc. No 35. On 3 September 2021, the court denied Mr Megas `s request to hold a telephone hearing. Doc. No. 36. The judge `s decision to deny the request for a telephone hearing was not only stupid but in reality smacks collusion with the Plaintiff. There was no justification for the judge`s decision and the order was impossible to comply with because as has been pointed out several times already, the US borders were shut to foreign travelers.

3.28. On the same day, Mr Megas filed a notice of his inability to attend the hearing in person. Doc. No. 38. On 5 September 2021, Mr. Megas refiled his motion to dismiss the default judgement. Doc. No 37.

3.29. After the court rescheduled the hearing on the motion to October 28, 2021, Doc. Nos. 40, 41, Mr Megas again requested that the court hold the hearing telephonically Doc. No. 42. The court denied this request. Doc. no 43. Again, more bias and issuing an order which was illegal and could not be complied with, it would be funny if it was not so serious and blatant.

3.30. Mr Megas then moved for recusal of the Judge, October 27, 2021. Doc., No 44. On 28 October, 2021, the court attempted to conduct the hearing but Mr Megas did not appear. Doc No 46. Of course he did not appear. He had told the court he could not travel due to a medical condition and also because even without that problem travel to the USA from Switzerland was impossible because the US borders were closed to foreigners and there were no flights. What was Megas supposed to do, swim or row across the Atlantic?

14

15

PAGE 15 OF 27          18 AUGUST 2022

3.31. Consequently the court rescheduled the hearing for  20 November 2021,  allowing both parties to participate via telephone. Doc. No.47.

3.32. On November 10 2021, this court held a telephone hearing on Mr Megas `s motion to dismiss the default judgement. Doc.  Nos 49, 55. Shortly thereafter, the court denied the motion for recusal of the undersigned and ordered Mr Megas to file a supplemental brief to his motion to dismiss the default judgement, Doc. N. 51, which he did on December 10, 2021. Doc no. 54.  of course the judge would not recluse, a man who orders a 79 year old man to fly when he is proven ill and apparently does not know or understand that there was a worldwide pandemic as a result of which there are no flights and the borders are shut was never going to do the right decent thing and step back and allow somebody else to deal with this.

3.33. The SEC filed a response in opposition to Mr Megas `s supplemental response on January 10, 2022, Doc. No. 57, to which Mr Megas replied on 18 January, 2022. Doc. 58. On January 20, 2022 the court held another telephonic hearing on the motion. Doc. No. 59.

3.34. Mr Megas `s motion to dismiss the default judgement, originally docketed at Doc. No. 29 and refiled as Doc No.  37, is now ripe for disposition.

## 4. The Court Can And Should Have Granted The Motion To Set Aside The Default Judgement.

4.1. Rule 55© of the Federal Rules of Civil Procedure, which applies to a request to set aside a default judgement, states that a district court " may set aside a final default judgement under Rule 60(b). " Fed. R. Civ. P. 55 ©. Rule 60(b) sets forth defined circumstances under which the court may grant relief from a judgement, including:

15

Case 5 : 20-cv-01593-EGS     PAGE 16 OF 27                    18 AUGUST 2022

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trip under Rule 59(b)

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation misconduct by an opposing party;

(4) the judgement is void;

(5) the judgement has been satisfied, released, or discharged; it is based on an earlier judgement that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) Any other reason that justifies relief.

4.2. From the way the case has been handled by the Honorable Judge Edward G Smith, Megas asserts that pretty much each of those points is satisfied.

4.3. The SEC would not and could have not been prejudiced by granting Mr Megas 's motion, because at the moment the default judgement is not enforceable in Switzerland or the United Kingdom because of the failures to serve Megas in either country within the terms of the Hague Convention and the rules of those countries.

4.4. The SEC asked for a jury hearing and had Megas been served and allowed to enter a plea, he would have agreed. The court cannot decide if the Defendant has any meritorious defense because he has not been allowed to respond to the allegation; and, there was no culpable conduct of the defendant that led to the default; in fact the default lies with the SEC for bringing such an old case so near to the allegations being barred under the Statute of Limitations Gross v. Stereo Component Sys., Inc., 700 F.2D 120, 122 (3d Cir. 1983) (Citing Feliciano v. Reliant Tooling., 691 F.2d 653, 656 (3d Cir.1982). The judge said in his denial that "Generally, the court does not favor default judgements relative to a decision on its

16



PAGE 17 OF 27      18 AUGUST 2022

merits. See §55,518.05 in U.S. Currency, 728 F.2d at 194. " In passing upon default

judgements Rule 60(b) should be `given a liberal construction `. Any doubt should be

resolved in favor of the petition to set aside the judgement so that cases may be decided on

their merits . " Feliciano, 691 F.2d at 656 ( quoting Tozer v. Charles A. Krause Milling Co.,

189 F.2d 242, 245 ( 3d Cir. 1951). That is exactly what he has not done, and in fact for the

reasons explained the judge appears to have gone out of his way to make life as difficult for

the defendant as he could.

**5.   Rule 60(B) Motion Generally**

5.1. The judge says that the first Feliciano factor asks us to consider whether the SEC would

suffer any prejudice if the court opened the judgement. Here, the SEC has not demonstrated

any prejudice would ensue if the court granted Mr Megas`s motion to dismiss the default

judgement. As in Feliciano, the SEC has "not asserted loss of available evidence,  increased

potential for fraud or collusion, or substantial reliance upon the judgement to support a

finding of prejudice". 691 F. 2d at 657 ( citing Farnese v. Bagnasco, 687  F. 2d 761,,  764

( 3d Cir. 1982 ). As such, this first factor weighs in favor of Mr Megas; but then goes on to

say that the second and third factors, however , overwhelmingly favors the SEC, that is not

correct.

5.2. Megas has, not been given the opportunity to answer the claim and present a defense and

test the claims made by the SEC before a jury, but as far as the circumstances have permitted

he has presented a meritorious defense to this action, meaning the second factor does not

weigh in the SEC `s favor and if the truth be told this is why the judge is trying to shut down

the case.

17

5.3. Finally the third factor "focuses on whether the defendant was culpable, that is, whether he acted willfully or in bad faith",Feliciano,-691 F.2d at 657. The judge says that Mr Megas knew about his litigation long before the court entered the judgement. That is not true. He knew the Swiss police wanted to speak to him and went to the police station to find out why but was not served. The Judge had attempted to facilitate the SEC getting a default judgement on a case which is not plausible on its face and which has serious questions about the admissibility of some, if not all, of the evidence.

## 6.  Misrepresentation or Misconduct Under Rule 60(b)(3)

6.1. Mr Megas`s first argument in his motion to dismiss the default judgement arises under Rule 60(b)(3), which permits the court to vacate a final judgement where there is  "fraud… misrepresentation, or misconduct by an opposing party." Fed. R. Civ.  P.  60(b)(3).  Mr Megas argues the SEC `s motions for time extensions "were bad faith filings and amounted to an abuse of process". Def, `s Mot. °II 4.

6.2. Megas contends the SEC engaged in "misrepresentation, or misconduct." Id. at ECF p. 8.6. For Mr Megas`s Rule  60(b)(3)argument to succeed,  he must establish, "by clear and convincing evidence" that the SEC engaged in fraud or other misconduct, and that this misconduct prevent  him from fully and fairly presenting his case."  Gochin v. Thomas Jefferson Univ., 667 F. App `s x 365 ( 3 Cir. 2016) (per curium) (citing Brown v. Pa. R. R. Co.,).

6.3. Up to the moment that the Swiss Police returned the unexecuted service document in October 2020  the SEC and the court were abiding by the recognized rules of procedure. If the SEC wished to continue the process of service the SEC would have to continue to treat



18

Case 5 : 20-cv-01593-EGS          PAGE 19 OF 27          18 AUGUST 2022

him as a Swiss resident which the SEC recognized in its own documentation and supported by the confirmation of the Swiss Police. In so doing the SEC would have to start The Hague Convention process again to serve in Switzerland. The Hague Convention process also applies to all Western European countries for example the UK. The SEC did not undertake to make an application under the Hague Convention for the service of documents as it is so required for the UK when the SEC involved itself in the UK.

6.4. Mr Megas has met this burden of demonstrating that the SEC Subsequent to 9 October 2020 the court and the SEC repeatedly acted outside of the accepted rules of the Hague Convention trying to serve him outside of the accepted rules of the Convention . The judge says that in each of its extension requests, the SEC submitted an ample factual record illustrating "good cause" for the extension as Rule 4(m) of the Federal Rules of Civil Procedure requires. Fed.R. Civ. P.4(m) see Doc Nos 8,13,15.

6.5. As demonstrated this is not correct. The SEC having commenced its proceedings against Megas under the auspices of the Hague Convention simply dispensed with this requirement in tandem with judge and court.   The judge gave the SEC plenty of time to serve, almost 160 days. Once the Hague Convention request was returned then the SEC were back at square one and would have to reapply under the Hague Convention to continue with the case.   The SEC did not do so. As illustrated contrary to the judge`s assertions the SEC motions after October 2020 do not provide considerable evidence of its diligent and good faith efforts to serve Mr Megas.  See id.

6.6. The judge says in its October 2020 motion for an extension of time, the SEC again included information from the Swiss authorities demonstrating the authorities could not locate Mr Megas despite their diligent efforts. That is not accurate. The Swiss Police said that Megas was legally domiciled at the address See Mom of Law in Supp. of Pl. `s Mot. for Extension

19



of Time to serve Def. Thomas Megas at 1-2, Doc No 13.  Nor is it true what the judge says that in the light of this failure, the SEC reasonably requested an extension to make other efforts to locate Mr Megas and determine the best alternative method of serving him. The SEC and the judge knew that the matters were out of time and because the Hague request had been returned unexecuted the case was dead in the water.  .

6.7. The efforts to serve Mr Megas in the UK were also fatally flawed because of the reasons stated previously they did not follow the Hague Convention protocol. Likewise, it is moot that an email address appeared active. See id. at 4. because it is not permissible to serve a resident in Switzerland by email, and once again the court determined incorrectly that the SEC had made a good cause showing and again incorrectly granted its request.

6.8. Contrary to what the judge claims, Mr Megas does provide evidence of the SEC`s misconduct  or misrepresentation, and the SEC had not demonstrated diligent efforts that complied with the laws of Switzerland and or the UK in trying to serve Mr Megas, the necessary "god cause" Rule 4(m) required for extensions more than meets the high burden of proof required to vacate the default judgement under Rule 60(b)(3).

## 7.   Void judgement Under Rule 60(b)(4)

7.1. Mr. Megas argued the court should have vacated the default judgement under rule 60(b)(4) because he was not properly served with the complaint and, as such, the judgement is void. Def. Mot. at °II 45. The Honorable judge makes great play about whether or not Megas read an email from the SEC but it is irrelevant because Switzerland has expressly objected to Article 10 of the Hague -Convention and does not permit service via post or email.

7.2. Under Rule 4(f)(3) the proffered alternatives to personal service were prohibited by International agreement and they comported with constitutional notions of due process. Convergen Energy LLC  v. Brooks and because Megas argued that service by email was prohibited by international agreement, the court must focus its analysis on whether email service comported with due process. The significance of these cases is that Switzerland invoked the reservation in Article 10(a) of the Hague Convention under which they declared their objection to service through postal and email channels. One of the Rule 4(f)(3) requirements is that service by a `means not prohibited by international agreement, `and according to the defendants `argument supported by the US Embassy in Switzerland and the US Marshall service by email cannot be allowed in a country that objected to service under the methods in Article 10(a). courts regularly make the point that receipt of served papers does not establish service if the method of service is not proper.

7.3. In dismissing Megas `s request to set aside, the judge says that "Rule 60(b)(4) does not provide license for litigants to sleep on their rights." Id at 275.  yet that is what the SEC have done. Many of the allegations apparently happened in 2014 to 2015. The other defendant Lahr has been in prison for three years, so it begs the question why the SEC waited so long. Megas did not sit on his rights, and acted as soon as he heard of the default judgement.

7.4. The judge says that the situation here is far from the "exceptional case" warranting Rule 60(b)(4) relief Id. and that rule Rule 4(f) "directs that when there are no internationally agreed means of service, such as those codified by the Hague Convention or otherwise alternative service may be permissible, so long as service is ordered by the court and is not prohibited by international agreement." Sec. & Exch. Comm`n  v. Dubovoy, Civ. A. No 15-6076(MCA)(MAH), 2016 WL 7217607, at *2 (D.N.J. Dec. 13, 2016).   "Where a

21

evidence of a "jurisdictional error or a violation of due process," the court cannot grant relief under Rule 60(b)(4).

7.9. The judge refers to Mr Megas 's own testimony during the courts November 10, 2021 hearing on the motion. Megas was not legally represented and found himself under cross examination by the SEC attorney and a judge, who had not made any attempt to disguise his bias in favor of the plaintiff and a total disregard for the rights of the Defendant. In short Megas feels he was ambushed by two attorneys acting for the prosecution. The judge has deliberately misconstrued what Megas was trying to say on the call. Megas knew that the SEC had launched an investigation into the conduct of Todd Lahr and Megas had communicated with the SEC. He was not aware that he was the subject of the investigation and had not been notified by the SEC he was subject to investigation, which opens up a whole new issue over self incrimination which he would raise at trial before a jury. This is not the same as knowing he was subject to process and that the SEC was trying to serve him.

7.10. Megas knew that the police had been to his address but did not actually know why or that he was subject to civil proceedings until somebody he was doing business with pulled out of a deal citing the default judgement.

7.11. It is irrelevant if he may have made changes to his email account while the SEC attempted to serve him at that address, because Megas is a Swiss resident the SEC are prohibited from serving by post or email. Furthermore the Swiss Police had returned the Hague Convention request to the SEC unexecuted. The court should have directed the SEC to make a second separate Hague Convention request to the UK to serve Megas along with a new separate request to the Swiss requesting service by post or email, but the court and the SEC did not do so because they probably knew that while the request to the UK would have gone

23

defendant's  address is not known , the Hague Convention does not apply, and where attempts at personal service have been futile, service may be 'by other means not prohibited by international agreement as may be directed by the court." Braverman Kaskey, P.C.  v Toidze, Civ. A. No 09-3470, 2013 WL 6095679, at *4 (E.D. Pa. Nov 19, 2013), afford, 599 F. App 'x 448 (3 Cir. 2015). The judges own word support Megas in that Switzerland has expressly prohibited service by email and mail. The defendant 's address is known to the SEC and was confirmed a matter of weeks after the case was filed so the Hague Convention most certainly does apply.

7.5. It is not Megas 's fault that the SEC 's attempts to serve Mr Megas were futile, but the court exceeded its authority and acted unlawfully when it continued to grant extensions. Rule 4 allows for 90 days and one has to take into consideration the difficulty the Coronavirus pandemic brought and so maybe one extension would have been reasonable giving the SEC 180 days, but the judge gave the SEC 325 days and even then Megas was not served because the court authorized alternative service to known mail address.  See Order Granting PL. 'Mot. to Authorise Alternative Service , Doc.No. 17.

7.6. The court cannot override the law of another country and so contrary to what the judge says in his memorandum dismissing Megas 's request to set aside default judgement, the method of service used by the SEC was not proper when the judge granted the pPlaintiff 's motion for default judgement. Final J. as to Def Thomas Megas ("Final J"), Doc. No. 27.

7.7. It follows that because Megas had not been served and because the US borders were shut, there were no flights from Switzerland to the USA the judge could not order Megas to make a personal appearance for an administrative hearing.

7.8. The court was wrong to with regards to both determinations, as there was not ample factual record to permit alternative service via email. Because Mr Megas has not provided any

22

through, matters were out of time and the Swiss would have refused to allow service by post or email.

7.12. Megas did not "Sleep on his rights", but the SEC did, which is why all the allegations against Megas are out of time. The FBI with SEC assistance had brought a criminal

7.13. Rule 60(b)(4) does permit Mr Megas the relief he is seeking and Mr. Megas has shown that the court's July 30, 2021 order granting a default judgement is fatally flawed and that the court should have granted him relief under Rule 60(b)(4).

7.14. The last thing to raise is that the judge totally ignored the fact that Megas told the court that if the judgement was set aside he would accept service and fight the case on its merits, yet the judge ignored that. A cynic would say that is because he knows that the claim against Megas is without merit and is fatally flawed, because it is out of time, the claims are not plausible on its face and contains evidence about Megas 's personal banking that have been obtained illegally and the whole claim is an abuse of process.

## 8.   CONCLUSION

Mr Megas  requests that the Appeal court reverse the decision of the lower court and dismiss the default judgement against him, because the SEC and the Judge engaged in misconduct and that the service was improper and never actually executed.

The default judgment is not enforceable outside  the USA because neither the Swiss or UK courts will allow it to be domesticated as Megas was not served in accordance with the Hague Convention. As the default the judgement is unenforceable it is in effect null and void.

24

**25**

Case 5 : 20-cv-01593-EGS          PAGE 25 OF 27          18 AUFUST 2022

Megas has shown that he was subject to some very bizarre biased decisions by the judge which were procedurally incorrect, illegal and biased.

Megas has offered the SEC and the court the opportunity to have the case heard on its merits which they have refuse, probably because they know that if the evidence were tested in front of a jury they would lose.

Dated 16 August 2022                          Respectfully Submitted

Thomas Megas

tpm8@harolds.ch

+41275652617

25

Case 5 : 20-cv-01593-EGS   PAGE 26 OF 27   18 AUGUST 2022

IN THE THIRD CIRCUIT APPEAL COURT UNITED STATES DISTRICT COURT EASTERN

DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE       :
COMMISSION                             :
                                              :
         PLAINTIFF                   :
                                                          CASE 5 : 20-CV-01593-EGS
         V

THOMAS MEGAS

         DEFENDANT (PRO SE)

APPEAL BY THOMAS MEGAS (PRO SE)TO DISMISS THE DECISION REACHED IN THE
CASE 5: 20-CV-0159-EGS OF THE SECURITIES EXCHANGE COMMISSION V TODD LAHR
AND THOMAS MEGAS REACHED BY THE  EASTERN DISTICT COURT ON 20 JULY 2022

# EXHIBIT LIST

**EXHIBIT 1- Megas Swiss Permits**

**EXHIBIT 2 – SEC Filing**

**EXHIBIT 3 - Letter of Swiss Police**

**EXHIBIT 4 - Proof of attendance at the police station**

**EXHIBIT 5  – UK  CPR 6**

**EXHIBIT 6 - US Department of Justice Service under the Hague Convention – see page 4 re**

**service in Switzerland**

**EXHIBIT 7 – Screen shot of the US Embassy to Switzerland website re Service in Switzerland**

**under Hague Convention**

26

27

Case 5 : 20-cv-01593-EGS     PAGE 27 OF 27        18 AUGUST 2022

**EXHIBIT 8 - Court Rules re Covid.**

**EXHIBIT 9 - Letter To Judge Juan R Sanchez**

27

**28**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 20-1593 |
| | : | |
| v. | : | |
| | : | |
| TODD LAHR and THOMAS MEGAS, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                    July 20, 2022

Over the course of ten months, the plaintiff, an independent agency of the United States, attempted to serve and contact one of the defendants, who had been charged with operating an offering fraud and Ponzi scheme and engaging in the unlawful unregistered sales of securities involving two entities. When the defendant did not respond to the complaint or otherwise contact the plaintiff or this court, despite evidence he knew of the litigation, this court entered a default judgment against him. Shortly thereafter, the defendant filed a motion to dismiss the default judgment, arguing the plaintiff (1) engaged in misconduct that prevented the defendant from fully and fairly presenting his case and (2) improperly served him, rendering the default judgment void. Both claims arise under Rule 60(b) of the Federal Rules of Civil Procedure, which provides relief from a default judgment only in limited circumstances. Because the defendant has not provided evidence of such limited circumstances, the court will deny his motion to dismiss the default judgment.

**29**

## I.   FACTUAL AND PROCEDURAL HISTORY

The plaintiff, the United States Securities and Exchange Commission ("SEC"), initiated this action by filing a complaint against the defendants, Todd Lahr ("Mr. Lahr") and Thomas Megas ("Mr. Megas"), on March 23, 2020.[1] Doc. No. 1. In the complaint, the SEC asserted the defendants fraudulently operated an offering fraud and Ponzi scheme, through which they sold over a million dollars in unregistered securities consisting of promissory notes in THL Holdings LLC ("THL Holdings") and common stock and warrants in Ferran Global Holdings, Inc. ("Ferran"). Compl. at ¶ 1, Doc. No. 1. In doing so, the defendants allegedly violated the anti-fraud and registration provisions of the federal securities laws, including: Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a) & (c); Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. *Id.* at ¶ 2.

Regarding the SEC's claims against Mr. Lahr, the SEC and Mr. Lahr settled those claims, and the SEC filed a consent motion for the entry of a final judgment against Mr. Lahr. Doc. No. 10. The court granted this motion and then entered a separate final judgment against Mr. Lahr on June 23, 2020. Doc. Nos. 11, 12.

As for the SEC's claims against Mr. Megas, because it believed Mr. Megas resided in Switzerland, the SEC first attempted to serve him by issuing a request to the Swiss authorities under the Hague Convention for Service Abroad of Judicial or Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"). *See* Decl. of Matthew Scarlato ("Scarlato Decl.") at ¶ 3, Doc. No. 32-1.[2] In a letter dated April 27, 2020, the Swiss authorities informed the SEC

---

[1] Although it does not appear that the Clerk's Office docketed the complaint until March 24, 2020, the Clerk's Office has designated March 23, 2020 as the filing date. *See* Notation Accompanying Doc. No. 1.

[2] The SEC believed it was acting in accordance with Rule 4(f) of the Federal Rules of Civil Procedure. *See* Scarlato Decl. at ¶ 3.

that their attempt to serve Mr. Megas at his last known address was unsuccessful. *Id*. Ex. 1, Doc. No. 32-2; *see also id.* at ¶ 4 (describing letter). The Swiss authorities attached a police report to this letter, which confirmed Mr. Megas was legally domiciled at the address but would be abroad until late August 2020. *Id*. Ex. 2, Doc. No. 32-3. The report stated Mr. Megas did "not want to receive anything between now and then and that he would follow up with us upon his return to Switzerland." *Id.* Given this information, the Swiss authorities indicated they would attempt to serve Mr. Megas again in September 2020. *Id.* Ex. 1.

On May 26, 2020, this court provided notice to the SEC that it had until June 23, 2020, to serve Mr. Megas or face dismissal without prejudice in accordance with Rule 4(m) of the Federal Rules of Civil Procedure. Doc. No. 5. On June 18, 2020, the SEC timely moved for an extension until October 15, 2020, to serve Mr. Megas, Doc. No. 8, which this court granted after finding that the plaintiffs established good cause for the requested extension. Doc. No. 9.

As promised, the Swiss authorities made several efforts to contact Mr. Megas via telephone and to effect service upon him at his known address in September 2020. Scarlato Decl. at ¶ 5. Those efforts, as well as a final attempt on October 11, 2020, were unsuccessful. *Id*. at ¶¶ 5–7. On October 19, 2020, the Swiss authorities sent the SEC a letter formally returning its Hague Convention service request as unexecuted. *Id*. Ex. 3, Doc. No. 32-4.

Because the SEC was unable to serve Mr. Megas, it timely filed a motion on October 15, 2020, seeking another extension until December 14, 2020, to locate and serve Mr. Megas. Doc. No. 13. This court granted the SEC's motion and extended the time for it to serve to December 14, 2020. Doc. No. 14.

During this extended period, the SEC attempted to learn Mr. Megas's whereabouts by submitting a request to its counterpart in Switzerland, the Swiss Financial Market Supervisory

Authority ("FINMA"), for Mr. Megas's travel records, known telephone numbers and email addresses, and any other information that might help the SEC determine Mr. Megas's location. Scarlato Decl. at ¶ 9. FINMA was unable to confirm or deny Mr. Megas's whereabouts and stated it did not have the authority to request Mr. Megas's travel records. *Id.* Ex. 4, Doc. No. 32-5; *see also id.* at ¶ 9.

The SEC also requested Mr. Megas's travel records from the United States Department of Homeland Security ("DHS"), searched DHS databases, and contacted Mr. Megas's known United States contacts, including Mr. Lahr. *Id.* at ¶ 10. These efforts did not produce useful information. *Id.* After conducting public internet searches, however, the SEC finally uncovered relevant material, namely, that Mr. Megas was listed as a current or former director of four companies in the United Kingdom. *Id.* at ¶ 11 and Ex. 5, Doc. No. 32-6. These records listed several addresses in the United Kingdom. *Id.* at ¶ 11 and Ex. 5.

The SEC made further progress on October 27, 2020, when counsel for the SEC emailed Mr. Megas at his known email address, tpm14@hotmail.com. *Id.* at ¶ 13 and Ex. 6, Doc. No. 32-7. In sending the email, the SEC used a technology platform called RPost that provides proof of delivery and read receipts if the recipient opens the email. *Id.* at ¶ 14. RPost confirmed the email to Mr. Megas was delivered successfully. *Id.* at ¶ 14 and Ex. 7, Doc. No. 32-8; *see also id.* at ¶ 15 ("After sending the October 27, 2020 email to Megas, I did not receive a return message that the email was returned undelivered.").

On December 14, 2020, in light of Mr. Megas's active email account and United Kingdom addresses, the SEC moved for additional time to serve Mr. Megas at possible residential addresses in the United Kingdom, and, alternatively, to authorize alternative service via Mr. Megas's known

**32**

email address. Doc. No. 15. This court granted the motion on December 17, 2020, and extended the time for the SEC to serve Mr. Megas until May 28, 2021. Doc. No. 18.

In January 2021, the SEC unsuccessfully attempted to serve Mr. Megas in the United Kingdom, and there was no indication he resided at any of the United Kingdom addresses. Scarlato Decl. at ¶ 16. On February 10, 2021, the SEC served Mr. Megas with the summons and complaint at his known email address, tpm14@hotmail.com, and it received an RPost confirmation that the email was delivered. *Id.* at ¶¶ 17, 18, and Exs. 8–9, Doc. Nos. 32-9, 32-10. Shortly after sending the email, the SEC received an automated reply stating, "it has not been possible to deliver your message to tpm14@hotmail.com as the account does not appear to be in use." *Id.* at ¶ 19 and Ex. 10, Doc. No. 32-11. Notably, the SEC did not receive this reply after its October 27, 2020 email to the same account.[3]

On April 29, 2021, the SEC submitted a request for default against Mr. Megas pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, Doc. No. 22, and the Clerk of Court entered default against Mr. Megas later that day. *See* Unnumbered Docket Entries Between Doc. Nos. 22 and 23. The SEC then filed a motion for default judgment on July 20, 2021. Doc. No. 24. It attempted to serve Mr. Megas with this motion via email but received a response from Hotmail indicating the account had been deactivated. Scarlato Decl. at ¶ 21 and Ex. 12, Doc. No. 32-13.

On July 21, 2021, this court scheduled a July 30, 2021 hearing on the SEC's motion for default judgment. Doc. No. 25. Again, counsel for the SEC attempted to serve Mr. Megas with

---

[3] Counsel for the SEC indicated that he

> sent an email to an inactive Hotmail address to be able to compare its format with the format of the automated response I received from Megas' Hotmail account. After sending, I received an automated reply from Hotmail, a copy of which is attached hereto as Exhibit 11. It has several obvious differences with the format of the automated response I received in response to my February 10, 2021 email to Megas, including a different subject line, and different message body.

Scarlato Decl. at ¶ 20.

this order at his email address but received a response from Hotmail that the account had been deactivated. Scarlato Decl. at ¶ 22 and Ex. 13, Doc. No. 32-14.

On July 30, 2021, this court held a hearing on the SEC's motion for a default judgment. Mr. Megas did not participate or otherwise contact the SEC or this court by the time of the hearing. *Id*. at ¶ 24. At the conclusion of the hearing, the court granted the motion and issued a default judgment against Mr. Megas. Doc. No. 27.

Several days later, on August 5, 2021, Mr. Megas filed a motion to dismiss the default judgment. Doc. No. 29. On August 10, 2021, the court entered an order setting a response date for the SEC and scheduling an in-person hearing on this motion for September 10, 2021. Doc. No. 30. On August 18, 2021, Mr. Megas requested that the court hold the hearing telephonically. Doc. No. 31. The SEC filed a response in opposition to the motion to dismiss the default judgment on August 24, 2021. Doc. No. 32. Mr. Megas filed a reply on August 29, 2021. Doc. No. 33. One day later, on August 30, 2021, the SEC submitted a supplemental filing in opposition to the motion. Doc. No. 34. Mr. Megas responded the following day. Doc. No. 35. On September 3, 2021, the court denied Mr. Megas's request to hold the hearing via telephone. Doc. No. 36.

On the same day, Mr. Megas filed a notice of his inability to attend the hearing in person. Doc. No. 38. On September 5, 2021, Mr. Megas refiled his motion to dismiss the default judgment. Doc. No. 37.

After the court rescheduled the hearing on the motion to October 28, 2021, Doc. Nos. 40, 41, Mr. Megas again requested that the court hold the hearing telephonically. Doc. No. 42. The court denied this request. Doc. No. 43. Mr. Megas then moved for recusal of the undersigned on October 27, 2021. Doc. No. 44. On October 28, 2021, the court attempted to conduct the hearing,

but Mr. Megas did not appear. Doc. No. 46. Consequently, the court rescheduled the hearing for November 10, 2021, allowing both parties to participate via telephone. Doc. No. 47.

On November 10, 2021, this court held a telephonic hearing on Mr. Megas's motion to dismiss the default judgment. Doc. Nos. 49, 55. Shortly thereafter, the court denied the motion for recusal of the undersigned and ordered Mr. Megas to file a supplemental brief to his motion to dismiss the default judgment, Doc. No. 51, which he did on December 10, 2021. Doc. No. 54.[4] The SEC filed a response in opposition to Mr. Megas's supplemental response on January 10, 2022, Doc. No. 57, to which Mr. Megas replied on January 18, 2022. Doc. No. 58. On January 20, 2022, the court held another telephonic hearing on the motion. Doc. No. 59.

Mr. Megas's motion to dismiss the default judgment, originally docketed at Doc. No. 29 and refiled as Doc. No. 37, is now ripe for disposition.

## II.    DISCUSSION

In the motion to dismiss the default judgment, Mr. Megas contends the court should dismiss/strike the judgment under Rules 55(c) and 60(b) of the Federal Rules of Civil Procedure insofar as the SEC allegedly (1) engaged in misconduct that prevented him from fully and fairly presenting his case and (2) improperly served him, rendering the default judgment void. *See* Def. Thomas Megas Mot. the Ct. to Dismiss the Default J. Against Him Entered on 30th July 2021 ("Def.'s Mot.") at ECF pp. 3–8, Doc. No. 37. Mr. Megas also appears to argue in his supplemental submission that the court should grant his motion because the court lacks personal jurisdiction over him. *See* Br. at pp. 10–11, Doc. No. 54.[5] The court will first address Mr. Megas's personal jurisdiction argument before addressing his Rule 60(b) claims.

---

[4] The Clerk's Office appears to have unsuccessfully attempted to docket Mr. Megas's supplemental response on two occasions prior to docketing the full response. *See* Doc. Nos. 52, 53.

[5] Unfortunately, the Clerk's Office docketed each page of Mr. Megas's submission as a separate docket number. The court has omitted references to these docket numbers.

### A.   **Personal Jurisdiction**

Mr. Megas argues this court lacks personal jurisdiction over him. *See id*. at 10–11. He contends "[t]he nature of [his] visits to the USA are not adequate to establish 'minimum contacts,' . . . there is no evidence of [him] engaging in any activities in Eastern Pennsylvania." *Id.*

To assert personal jurisdiction over a defendant, the court must determine the defendant possesses "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Because the SEC brought this case pursuant to two federal statutes that permit nationwide service of process, *see* 15 U.S.C. §§ 77aa(a), 78u(c), this court analyzes personal jurisdiction "on the basis of the defendant's national contacts." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002) (citations omitted). Specifically, the court examines "both the extent to which [the defendant] availed himself of the privileges of American law and the extent to which [the defendant] could reasonably anticipate being involved in litigation in the United States." *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 295 (3d Cir. 1985).

Here, the complaint sufficiently satisfies the minimum contacts analysis; Mr. Megas had numerous contacts with the United States related to the unlawful conduct the complaint alleges. Ferran, one of the companies through which Mr. Megas and Mr. Lahr executed their alleged fraud, was a United States securities issuer and Mr. Megas was its CEO, treasurer, and chairman of its board of directors. Compl. at ¶ 9. Mr. Megas also filed a Form D with the SEC concerning Ferran's fundraising. *Id.* at ¶ 31. As part of Ferran's allegedly fraudulent activity, Mr. Megas communicated with Mr. Lahr, who resided in the Eastern District of Pennsylvania, and traveled to the United States to meet with investment bankers. *Id.* at ¶¶ 5, 25–27, 85. In addition, Mr. Megas received

wires of Ferran investor funds from Ferran's United States bank account and sent two wires to bank accounts Mr. Lahr controlled in the United States. *Id.* at ¶ 5. These numerous contacts with the United States adequately put Mr. Megas on notice that he could anticipate being involved in litigation in the United States. Accordingly, this court possesses personal jurisdiction over Mr. Megas.

### B.       Mr. Megas's Rule 60(b) Claims

#### 1.       Standard of Review

Rule 55(c) of the Federal Rules of Civil Procedure, which applies to a request to set aside a default judgment, states that a district court "may set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). Rule 60(b) sets forth defined circumstances under which the court may grant relief from a judgment, including:

**(1)** mistake, inadvertence, surprise, or excusable neglect;

**(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

**(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

**(4)** the judgment is void;

**(5)** the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

**(6)** any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

A decision to set aside a default judgment pursuant to Rule 60(b) falls "primarily to the discretion of the district court." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984). In exercising that discretion, the court should consider "first, whether the plaintiff

9

**37**

will be prejudiced; second, whether the defendant has a meritorious defense; and third, whether culpable conduct of the defendant led to the default." *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 122 (3d Cir. 1983) (citing *Feliciano v. Reliant Tooling Co.,* 691 F.2d 653, 656 (3d Cir.1982). Generally, the court does not favor default judgments relative to a decision on the merits. *See $55,518.05 in U.S. Currency*, 728 F.2d at 194. "[I]n passing upon default judgments Rule 60(b) should be 'given a liberal construction.... Any doubt should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits.'" *Feliciano*, 691 F.2d at 656 (quoting *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir. 1951)).

Here, as indicated above, Mr. Megas seeks relief under Rule 60(b)(3) and (b)(4). The court will first address the *Feliciano* factors and then consider each of his contentions in turn.

### 2. Rule 60(b) Motion Generally

The first *Feliciano* factor asks us to consider whether the SEC would suffer any prejudice if the court opened the judgment. Here, the SEC has not demonstrated any prejudice would ensue if the court granted Mr. Megas's motion to dismiss the default judgment. As in *Feliciano*, the SEC has "not asserted loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment to support a finding of prejudice." 691 F.2d at 657 (citing *Farnese v. Bagnasco*, 687 F.2d 761, 764 (3d Cir. 1982)). As such, this first factor weighs in favor of Mr. Megas; the second and third factors, however, overwhelmingly favor the SEC.

As to the second factor, "[t]he showing of a meritorious defense is accomplished when 'allegations of defendant's answer, if established on trial, would constitute a complete defense to the action.'" *$55,518.05 in U.S. Currency*, 728 F.2d at 195 (quoting *Tozer*, 189 F.2d at 245). Mr. Megas has failed to allege anything beyond simple denials or conclusionary statements. He has

10

**38**

not presented a meritorious defense to this action, meaning the second factor weighs in the SEC's favor.

Finally, the third factor "focuses on whether the defendant was culpable, that is, whether it acted willfully or in bad faith." *Feliciano,* 691 F.2d at 657. As described in more detail below, Mr. Megas knew about this litigation long before the court entered the default judgment against him yet took no action until the court entered the judgment. His culpable conduct weighs in favor of the SEC.

Because Mr. Megas has not identified a meritorious defense and because Mr. Megas willfully avoided timely action in this matter, the *Feliciano* factors favor a denial of the motion for default judgment. For the sake of thoroughness, the court will now address each of Mr. Megas's individual arguments under Rule 60(b).

### 3.      Misrepresentation or Misconduct Under Rule 60(b)(3)

Mr. Megas's first argument in his motion to dismiss the default judgment arises under Rule 60(b)(3), which permits the court to vacate a final judgment where there is "fraud . . .misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Mr. Megas argues the SEC's motions for time extensions "were bad faith filings and amounted to an abuse of process." Def.'s Mot. at ¶ 4. He contends the SEC engaged in "misrepresentation, or misconduct." *Id.* at ECF p. 8.[6]

For Mr. Megas's Rule 60(b)(3) argument to succeed, he must establish, "by clear and convincing evidence" that the SEC "engaged in fraud or other misconduct, and that this misconduct prevented [him] from fully and fairly presenting [his] case." *Gochin v. Thomas Jefferson Univ.*, 667 F. App'x 365, 367 (3d Cir. 2016) (per curiam) (citing *Brown v. Pa. R.R. Co.*,

---

[6] The motion is unpaginated. As such, the court uses the pagination provided by ECF.

282 F.2d 522, 527 (3d Cir. 1960) and *Stridiron v. Stridiron*, 698 F.2d 204, 206–07 (3d Cir. 1983)). Mr. Megas "carries a heavy burden" to satisfy Rule 60(b)(3). *Id.*

Mr. Megas has not met this burden. He has failed to demonstrate the SEC engaged in any misrepresentation or misconduct. In each of its extension requests, the SEC submitted an ample factual record illustrating "good cause" for the extension as Rule 4(m) of the Federal Rules of Civil Procedure requires. Fed. R. Civ. P. 4(m); *see* Doc. Nos. 8, 13, 15. The SEC's motions provide considerable evidence of its diligent and good faith efforts to serve Mr. Megas. *See id.*

In seeking its first extension of time in June 2020, the SEC cited information it received from the Swiss authorities attempting to effect the SEC's Hague Convention request. *See* Mem. of Law in Supp. of Pl's Mot. for Extension of Time to Serve Def. at 1–2, Doc. No. 8. It indicated that "[o]n April 27, 2020, the Swiss authorities sent a letter to [SEC] counsel stating that their first attempt to serve Megas was unsuccessful because he was out of the country at the time, and that Megas was expected to return at the end of August 2020." *Id.* at 2. According to this letter, Mr. Megas told the authorities he did "not want to receive anything between now and then and that he would follow up with us upon his return to Switzerland." Scarlato Decl. Ex. 2. This report, based in part on Mr. Megas's *own* statement, prompted the SEC to file its motion for additional time to serve Mr. Megas, which the court granted.

In its October 2020 motion for an extension of time, the SEC again included information from Swiss authorities demonstrating the authorities could not locate Mr. Megas despite their diligent efforts. *See* Mem. of Law in Supp. of Pl.'s Mot. for Extension of Time to Serve Def. Thomas Megas at 1–2, Doc. No. 13. In light of this failure, the SEC reasonably requested an extension to make other efforts to locate Mr. Megas and determine the best alternative method of serving him.

12

**40**

The SEC's final motion for an extension of time to serve, which it filed in December 2020, provided a similarly thorough explanation. *See* Pl.'s Mem. in Supp. of Its Mot. to Authorize Alternative Service, or, Alternatively, to Grant an Extension of Time to Serve Def. Thomas Megas at 1–5, Doc. No. 15. In this motion, the SEC requested permission to serve Mr. Megas via email, or, alternatively, another extension of time to serve him. The SEC explained that it had recently learned of Mr. Megas's registered addresses in the United Kingdom, as well as an email address that appeared active. *See id.* at 4. Once again, the court determined the SEC had made a good cause showing and granted its request.

Because Mr. Megas does not provide any evidence of the SEC's alleged misconduct or misrepresentation, and because the SEC demonstrated its diligent efforts to serve Mr. Megas, which provided the "good cause" Rule 4(m) required for the extensions, Mr. Megas does not meet the high burden of proof required to vacate the default judgment under Rule 60(b)(3).

### 4.      Void Judgment Under Rule 60(b)(4)

Mr. Megas also argues the court should vacate the default judgment under Rule 60(b)(4) because he was not properly served with the complaint and, as such, the judgment is void. Def.'s Mot. at ¶ 45. He argues that (1) there is no evidence he read the SEC's email serving him and (2) Switzerland does not permit service via email. *Id.*

Rule 60(b)(4) only applies "in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (citations omitted). Courts reserve such relief "only for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *Id.* (citing *Nemaizer*

*v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986)). Notably, "Rule 60(b)(4) does not provide a license for litigants to sleep on their rights." *Id.* at 275.

The situation here is far from the "exceptional case" warranting Rule 60(b)(4) relief. *Id.* Rule 4(f) of the Federal Rules of Civil Procedure governs the service of individual defendants in foreign countries. Rule 4(f)(3) "directs that when there are no internationally agreed means of service, such as those means codified by the Hague Convention or otherwise, alternative service may be permissible, so long as service is ordered by the court and is not prohibited by international agreement." *Sec. & Exch. Comm'n v. Dubovoy*, Civ. A. No. 15-6076(MCA)(MAH), 2016 WL 7217607, at *2 (D.N.J. Dec. 13, 2016). "[W]here a defendant's address is not known, the Hague Convention does not apply, and where attempts at personal service have been futile, service may be 'by other means not prohibited by international agreement as may be directed by the court.'" *Braverman Kaskey, P.C. v. Toidze*, Civ. A. No. 09-3470, 2013 WL 6095679, at *4 (E.D. Pa. Nov. 19, 2013), *aff'd*, 599 F. App'x 448 (3d Cir. 2015).

As the SEC's attempts to serve Mr. Megas were futile, this court authorized alternative service to his known email address. *See* Order Granting Pl.'s Mot. to Authorize Alternative Service, Doc. No. 17. This court affirmed that method of service was proper when it granted the plaintiff's motion for default judgment. Final J. as to Def. Thomas Megas ("Final J."), Doc. No. 27. In making both determinations, the court found there was an ample factual record to permit alternative service via email. Because Mr. Megas has not provided any evidence of a "jurisdictional error or . . . a violation of due process," the court cannot grant relief under Rule 60(b)(4).

Mr. Megas's own testimony during the court's November 10, 2021 hearing on the motion to dismiss the default judgment corroborates this conclusion. During the hearing, Mr. Megas admitted he had notice of this litigation one year before the default judgment. Tr. of Hearing on

Motion for Default J. ("Hearing Tr."), at pp. 8:12–9:25; 16:14–17:8; 39:6–11, Doc. No. 55. He did not deny that he may have made changes to his email account while the SEC attempted to serve him at that address. He admitted he worked with a "team" of people that had access to the account and did not deny he may have asked someone to make changes to the account to make it seem as though he were not using it. *Id.* at pp. 24:23–28:18. His testimony confirms he knew about this litigation long before the court entered the default judgment against him. Rule 60(b)(4) does not permit Mr. Megas to "sleep on" his rights. *United Student Aid Funds, Inc.*, 559 U.S. at 275. Accordingly, Mr. Megas has not shown that the court's July 30, 2021 order granting a default judgment is void, and the court will not grant him relief under Rule 60(b)(4).

### III.    CONCLUSION

Mr. Megas believes the court should dismiss the default judgment entered against him, arguing the SEC engaged in misconduct and that service was improper. He also claims that the court lacked personal jurisdiction over him. For the reasons discussed above, this court had personal jurisdiction over Mr. Megas when the court entered default judgment against him. In addition, Mr. Megas has not satisfied his burden to show that the court should strike off that default judgment under Rule 60(b). Therefore, the court will deny Mr. Megas's motion to dismiss the default judgment.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.


15

**43**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 20-1593 |
| | : | |
| v. | : | |
| | : | |
| TODD LAHR and THOMAS MEGAS, | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this 20th day of July, 2022, after considering the motion to dismiss the default judgment filed by the *pro se* defendant, Thomas Megas (Doc. Nos. 29, 37), the response in opposition to the motion filed by the plaintiff (Doc. No. 32), the reply in further support of the motion filed by the defendant (Doc. No. 33), the supplemental filing in opposition to the motion filed by the plaintiff (Doc. No. 34), the response to the supplemental filing filed by the defendant (Doc. No. 35), the supplemental brief in support of the motion filed by the defendant (Doc. No. 54), the response in opposition to the supplemental brief filed by the plaintiff (Doc. No. 57), the reply to the response filed by the defendant (Doc. No. 58), and the evidence and argument presented during hearings on the motion to dismiss the default judgment on November 10, 2021 and January 20, 2022; accordingly, for the reasons set forth in the separately filed memorandum opinion, it is hereby **ORDERED** that the defendant's motion to dismiss the default judgment (Doc. Nos. 29, 37) is **DENIED**.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

**44**