# IN THE

# United States Court of Appeals
## FOR THE THIRD CIRCUIT

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

THOMAS MEGAS,

*Defendant-Appellant,*

and

TODD LAHR,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## REPLY BRIEF OF
## APPOINTED *AMICUS CURIAE* SUPPORTING APPELLANT

J. Scott Ballenger
Ben Buell (Third Year Law Student)
Jonathan Duval (Third Year Law Student)
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
Appellate Litigation Clinic
580 Massie Road
Charlottesville, VA 22903
202-701-4925
sballenger@law.virginia.edu

*Court Appointed Amicus Curiae Counsel Supporting Appellant*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................1

ARGUMENT .....................................................................................................4

I. THE HAGUE CONVENTION APPLIES BECAUSE MR. MEGAS'S SWISS ADDRESS WAS KNOWN TO THE SEC.................4

II. THE HAGUE CONVENTION IS AN "INTERNATIONAL AGREEMENT" THAT PROHIBITS SERVICE BY EMAIL AND DEFAULT JUDGMENT IN THESE CIRCUMSTANCES..........10

    A. There Was No Valid Service Under The Hague Convention.............10

    B. Article 15 Precluded A Default Judgment .........................................12

III. THE DISTRICT COURT ERRED OR ABUSED ITS DISCRETION IN DECLINING TO EVALUATE THE SEC'S COMPLIANCE WITH RULES (4)(F)(1) AND (F)(2) BEFORE RESORTING TO (F)(3).................................................................13

IV. THE MANNER IN WHICH THE SEC SERVED MR. MEGAS DID NOT SATISFY DUE PROCESS.......................................................18

    A. Attempting To Serve Mr. Megas Via His Hotmail Account Was Not Reasonably Calculated To Notify Him Of The Suit............18

    B. Actual Notice Does Not Defeat Mr. Megas's Due Process Claim .................................................................................................20

V. THE DISTRICT COURT ERRED OR ABUSED ITS DISCRETION WHEN IT REFUSED TO SET ASIDE THE DEFAULT JUDGMENT AND ALLOW MR. MEGAS TO DEFEND THIS CASE ON THE MERITS.............................................23

CONCLUSION ..................................................................................................26

COMBINED CERTIFICATES ........................................................................27

# TABLE OF AUTHORITIES

## Cases

*Agha v. Jacobs*,
   2008 WL 2051061 (N.D. Cal. May 13, 2008) ............................................ 11-12

*AngioDynamics, Inc. v. Biolitec AG*,
   780 F.3d 420 (1st Cir. 2015) ....................................................................... 15

*Backjoy Orthotics, L.L.C. v. Forvic International Inc.*,
   2016 WL 7664290 (M.D. Fla. Mar. 7, 2016) ............................................. 7-8

*Braverman Kaskey, P.C. v. Toidze*,
   599 F. App'x 448 (3d Cir. 2015) ............................................................... 6, 7

*C & F Sys., LLC v. Limpimax, S.A.*,
   2010 WL 65200 (W.D. Mich. Jan. 6, 2010) ................................................. 16

*Celgene Corp. v. Blanche Ltd.*,
   2017 WL 1282200 (D.N.J. Mar. 10, 2017) .................................................... 7

*D.light Design, Inc. v. Boxin Solar Co.*,
   2015 WL 526835 (N.D. Cal. Feb. 6, 2015) .................................................... 7

*Dolphin Cove Inn, Inc. v. Vessel Olympic Javelin*,
   2020 WL 4927590 (M.D. Fla. Aug. 21, 2020) ............................................... 7

*Drummond Co. v. Collingsworth*,
   2016 WL 9980715 (N.D. Ala. Oct. 18, 2016) ................................................ 7

*Elobied v. Baylock*,
   299 F.R.D. 105 (E.D. Pa. 2014) .................................................................... 12

*Emcasco Ins. Co. v. Sambrick*,
   834 F.2d 71 (3d Cir. 1987) ..................................................................... 24-25

*Enovative Techs., LLC v. Leor,*
622 F. App'x 212 (4th Cir. 2015) ................................................................. 15

*Feliciano v. Reliant Tooling Co.*,
   691 F.2d 653 (3d Cir. 1982) ......................................................................... 25

*Forum Financial Group, PLLC, v. President & Fellows of Harvard Coll.*,
   199 F.R.D. 22 (D. Me. 2001) ........................................................................ 17

*Gold Kist, Inc. v. Laurinburg Oil Co.*,
756 F.2d 14 (3d Cir. 1985) .......................................................................... 18

*Grand Ent. Grp. v. Star Media Sales, Inc.*,
988 F.2d 476 (3d Cir. 1993) ........................................................................ 22

*Hritz v. Woma Corp.*,
732 F.2d 1178 (3d Cir. 1984) ...................................................................... 24

*Krecioch v. U.nited States*,
221 F.3d 976 (7th Cir. 2000) ...................................................................... 19

*Linh Thi Minh Tran v. Clear Recon Corp.*,
2017 WL 626361 (D. Or. Feb. 15, 2017) ...................................................... 20

*Matter of Park Nursing Ctr., Inc.*,
766 F.2d 261 (6th Cir. 1985) ...................................................................... 19

*Mid-Continent Wood Prods., Inc. v. Harris*,
936 F.2d 297 (7th Cir. 1991) ...................................................................... 22

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) .............................................................................. 3, 19

*Nuance Communications, Inc. v. Abbyy Software House*,
626 F.3d 1222 (Fed. Cir. 2010) .................................................................. 15

*Phoenix Process Equipment Co. v. Capital Equipment & Trading Corp.*,
250 F. Supp. 3d 296 (W.D. Ky. 2017) .......................................................... 17

*Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equip. Co.*,
494 F. Supp. 3d 404 (N.D. Tex. 2020) .......................................................... 12

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ................................................................................ 16

*Rio Properties, Inc. v. Rio International Interlink*,
284 F.3d 1007 (9th Cir. 2002) ............................................................ 14-15, 17

*Sheets v. Yamaha Motors Corp.*,
891 F.2d 533 (5th Cir. 1990) ...................................................................... 23

*Stateside Machinery Co. v. Alperin*,
591 F.2d 234 (3d Cir. 1979) .................................................................. 18, 19

*Sunline USA LLC v. Ezzi Grp., Inc.*,
2022 WL 3691021 (E.D. Pa. Aug. 25, 2022) ..................................................... 7

*Tozer v. Charles A. Krause Milling Co.*,
189 F.2d 242 (3d Cir. 1951) ................................................................. 24

*Travers v. Fed. Express Corp.*,
8 F.4th 198 (3d Cir. 2021) ............................................................... 16

*U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*,
2008 WL 4299771 (N.D. Ill. Sept. 17, 2008) ..................................................... 7

*United States v. $55,518.05 in U.S. Currency*,
728 F.2d 192 (3d Cir. 1984) ................................................................. 24

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010) ................................................................... 21, 22

*Viahart, L.L.C. v. GangPeng*,
2022 WL 445161 (5th Cir. Feb. 14, 2022) .......................................................15

*Volkswagenwerk AG. v. Schlunk*,
486 U.S. 694 (1988) ......................................................................... 2

*Water Splash, Inc. v. Menon*,
581 U.S. 271 (2017) ........................................................................ 12

**Rules**

Fed. R. Civ. P. 4 ......................................................................... *passim*
Fed. R. Civ. P. 60 ...................................................................... 21, 22

**Other Authorities**

12 Moore's Federal Practice § 60.44[4] (3d ed. 2007)..........................................22

Convention (Hague) On The Service Abroad Of Judicial And Extrajudicial
Documents In Civil Or Commercial Matters (1965) ...................................... *passim*

International Judicial Assistance in Civil Matters ........................................... 9, 11

SR 311.0, art. 271 (1951)..................................................................11

# INTRODUCTION

The Securities and Exchange Commission knew Mr. Megas's Swiss address from the beginning of this litigation. That address was repeatedly confirmed by Swiss authorities, and its accuracy is not in dispute. That is enough to trigger the Hague Service Convention, and the district court erred in concluding otherwise.

The SEC's supplemental brief confirms what *amicus curiae* suspected: the Commission believes that a defendant's address becomes "not known" (and the Hague Convention inapplicable) whenever efforts at service under the Convention have failed despite the plaintiff's "reasonable diligence." Appellee's Br. at 11. But the SEC and the district court misread the Convention and the case law. Courts require a "reasonably diligent" search for the defendant's address when that address is genuinely unknown. We certainly do not believe "that all these courts are incorrect." Appellee's Br. at 15 n.4. But conflating a (reasonably diligent) failure to *serve* the defendant at his known address with a (reasonably diligent) failure to *discover* his address at all effectively nullifies the Convention's actual provisions governing failed attempts at service, replacing the specific rules outlined in Article 15 with a standard that appears nowhere in the treaty.

*Amicus* devoted a substantial portion of its Supplemental Brief to addressing how the Convention operates when a defendant's address *is* known but attempts at service have been unsuccessful. *See Amicus* Suppl. Br. at 29–40. We also analyzed

the deep split of authority on email service under the Convention, and explained how a receiving State's Article 10 objection to service by "postal channels" precludes service by email. Those issues are far from "irrelevant." Appellee's Br. at 11. Remarkably, the SEC's brief has no substantive response.

The SEC also fails to respond substantively to our points about the structure and purposes of Rule 4(f). Like most courts that have addressed the issue, the Commission cites uncritically to a twenty-year-old Ninth Circuit decision for the proposition that Rules 4(f)(1), (2), and (3) simply offer three alternatives that judges can choose from in any situation. But the Rule was drafted to implement to Hague Convention, and the Supreme Court's decision in *Volkswagenwerk Aktiengesellschaft v. Schlunk* holds that "compliance with the Convention," and therefore Rule 4(f)(1), "is mandatory in all cases to which it applies." 486 U.S. 694, 705 (1988). Rule 4(f)(2) also contains important limitations that would be wholly nullified if that Rule can just be skipped over, in all circumstances, for service under Rule 4(f)(3). The SEC has no response to those structural points, and its defense of the district court's discretionary decision here rests on the false premise that letters to certain *companies* affiliated with Mr. Megas in the United Kingdom appropriately exhausted the possibilities for service under Rule 4(f)(2).

Even if email service was permissible, the SEC should not have chosen a potentially defunct Hotmail account rather than Mr. Megas's known and primary

email address. The SEC says that plaintiffs need only use service methods that are "reasonably calculated" to effect notice, not the means "*best* calculated" to that end. Appellee's Br. at 24–25. But the Supreme Court has held that when no method "reasonably certain" to provide notice is available, "the form chosen [must] not [be] substantially less likely to bring home notice than other of the feasible and customary substitutes." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). The SEC relies on cases holding that when the defendant can be served by reliable and customary means like certified mail to his known address, the plaintiff need not also attempt service in person. None of those cases genuinely support using an address that is "substantially less likely to bring home notice," *id.*, than a different address that the plaintiff also knows. And the fact that Mr. Megas had general notice that some sort of litigation was pending does not preclude a due process claim.

Finally, the SEC declines to grapple with this Court's case law expressing a clear preference for adjudication on the merits. The SEC and the district court condemn Mr. Megas for not eagerly appearing in litigation halfway around the globe. As this Court has recognized, however, there are serious questions about the SEC's compliance with the Hague Convention in this case. Waiting to see if the district court would enter a default judgment in violation of the Convention, and then promptly appearing to contest that judgment, was not an unreasonable way for Mr. Megas to stand on his rights under these circumstances. The district court recognized

that the SEC would not be prejudiced if it were to set aside the default judgment and allow Mr. Megas to defend himself on the merits. This Court should give him the opportunity to do so, if it ultimately disagrees with his understanding of the Convention.

**ARGUMENT**

**I.      THE HAGUE CONVENTION APPLIES BECAUSE MR. MEGAS'S SWISS ADDRESS WAS KNOWN TO THE SEC**

Mr. Megas's address was known from the outset of this case, and its validity was repeatedly confirmed to the SEC by multiple Swiss authorities. The Commission repeats the district court's mistake by improperly conflating Mr. Megas's address with his temporary physical location. It contends, in effect, that whenever reasonably diligent efforts to serve a defendant at his known address fail, the plaintiff and the court can treat his address as unknown and ignore the Hague Convention entirely. That position is inconsistent with the language and structure of the Convention, and is not genuinely supported by the cases the Commission cites.

Article 1 provides that "[t]his Convention shall not apply where the address of the person to be served with the document is not known." It does not say that the Convention is inapplicable whenever the defendant's whereabouts are unknown, the defendant is not at home, or reasonably diligent efforts to serve the defendant at his home address have been unsuccessful. Instead, Article 15 has two provisions that specify the only appropriate circumstances for granting a default judgment. Article

4

15(1) allows a default judgment to be granted if service was accomplished through a method provided for in the Convention, or "by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions." Alternatively, Article 15(2) permits default judgment when "a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document" and "no certificate of any kind has been received."

The SEC conspicuously refuses to engage with the substance of those rules, but they are the Convention's solution to the problem the SEC perceived in this case. The Convention generally puts the Central Authority of the receiving State in the driver's seat unless it has been unresponsive and has not sent a certificate of any kind back to the sending State. The Convention also contemplates service by other means permitted in domestic actions, in keeping with principles of international comity. But Switzerland's internal approach to service of process, and its decision to opt out of Article 10, mean that the SEC (like ordinary Swiss citizens in domestic litigation) was required to go through the Swiss authorities rather than engaging in self-help.

The Convention does not permit foreign plaintiffs or courts to give up on seeking Convention-compliant service simply because the foreign Central Authority, while engaged and responsive, has not achieved service in any particular time frame. If a Central Authority was consistently sending back certificates but dilatory in its

service efforts, the remedy would be diplomatic, not legal. In any event, this record would not support that charge. Swiss authorities apparently outlined further options for service consistent with Swiss law, *see* JA141-42, but the Commission considered it more expedient to resort to Rule 4(f)(3).

The Commission misunderstands the purpose of the "reasonable diligence" case law, which requires reasonably diligent efforts to discover the defendant's address when that address is genuinely unknown. The Commission relies heavily on this Court's unpublished decision in *Braverman Kaskey, P.C. v. Toidze*, 599 F. App'x 448 (3d Cir. 2015), but that case only illustrates the Commission's error. In *Braverman*, a Russian national had moved from her previous known address in Canada to an unknown location in Russia. When the plaintiff visited her previous address, "[t]he individual living at the residence claimed [defendant] had moved." *Id.* at 450. The Canadian postal authorities also confirmed "that [defendant] had moved and [that] her mail forwarding account had expired." *Id.* at 451. Faced with clear evidence that the defendant no longer resided at her prior address and the failure of reasonably diligent efforts to discover her new address in Russia, the district court reasonably found that her address was "not known" and allowed service by publication. The Commission says that *amicus*'s position "cannot be squared with *Braverman*," Appellee's Br. at 11, but in this case no facts suggested, and no finding was made, that Mr. Megas had moved from his known address or established a new

6

residence elsewhere. *Braverman* certainly did not hold, as the SEC would have it, "that a foreign defendant's address is unknown if the plaintiff's 'good faith and practical efforts to personally serve [the defendant]' proves unsuccessful." Appellee's Br. at 13 (quoting *Braverman*, 599 F. App'x at 451–52).

Almost all of the case law the Commission relies upon follows that same pattern: reasonably diligent efforts to discover the defendant's address when no address was known or there was clear evidence that the defendant had moved.[1] The sole exception is the unreported district court decision in *Backjoy Orthotics, LLC v. Forvic International Inc.*, where the Middle District of Florida did reason that "failed service attempts at a particular address leads to the conclusion that the address is incorrect" and that "[t]he Hague Convention's use of the word 'address' does not

---

[1] *See, e.g.*, *Sunline USA LLC v. Ezzi Grp., Inc.*, 2022 WL 3691021, at *2 (E.D. Pa. Aug. 25, 2022) (process server reported "[defendant] is no longer at or known to" previous address); *Celgene Corp. v. Blanche Ltd.*, 2017 WL 1282200, at *3 (D.N.J. Mar. 10, 2017) ("[I]nvestigators determined that Blanche maintain[ed] no actual presence at [listed] address."); *Dolphin Cove Inn, Inc. v. Vessel Olympic Javelin*, 2020 WL 4927590, at *3 (M.D. Fla. Aug. 21, 2020) (defendant "was in St. Vincent" at an unknown address "and would only be returning to the US periodically"); *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 2008 WL 4299771, at *4 (N.D. Ill. Sept. 17, 2008) (defendant's known address "proved to be incorrect"); *D.Light Design, Inc. v. Boxin Solar Co.*, 2015 WL 526835, at *2 (N.D. Cal. Feb. 6, 2015) (the "physical addresses of [defendants] remain[ed] unknown" despite reasonable efforts of the plaintiff); *Drummond Co. v. Collingsworth*, 2016 WL 9980715, at *1 (N.D. Ala. Oct. 18, 2016) (it was "certain [defendant] no longer operate[d] out of any of his prior addresses") (internal quotations omitted)).

refer only to a static, physical address; rather, it refers broadly to the location of the defendant." 2016 WL 7664290, at *5 (M.D. Fla. Mar. 7, 2016). The court's concern was that a defendant might "establish a fixed address, all the while the defendant resides abroad, with no intention to visit that address" such that they "would be unservable at that address," rendering the Convention "meaningless." *Id. Backjoy Orthotics* did seem to be that sort of case; the addresses in question were never verified by any government but were gleaned from internet searches, patent applications, and business records, *id.* at *7, and the defendants made "no attempt to argue that their last-known addresses were anything more than addresses in name" only, *id.* at *5. But the right conclusion should have been that the defendants' purported addresses were a sham—not that there is no conceptual distinction between a defendant's home address and wherever he happens to be.

Respecting the actual language and structure of the Convention does not "sanction game-playing to avoid service." Appellee's Br. at 19. The Convention simply leaves to the law of the receiving State the question of whether and when unusual methods should be authorized because the defendant appears to be evading service. We do not know what the Swiss authorities advised the SEC to do, *see* JA141-42, but public guidance from the Swiss Federal Office of Justice explains that "the Swiss Civil Procedure Code permits the authorities to proceed with a public notice in Switzerland when the address of the addressee is unknown and cannot be

8

ascertained despite making reasonable enquiries or when service is impossible (see Art. 141 CPC)."[2] The referenced civil procedure code section provides that:

> Art. 141 Public notice
>
> 1. Service shall be effected by notice in the official gazette of the canton or in the Swiss Official Gazette of Commerce where:
>
>> a. the whereabouts of the addressee are unknown and cannot be ascertained despite making reasonable enquiries;
>>
>> b. service is impossible or would lead to exceptional inconvenience;
>>
>> c. if a party with domicile or registered office abroad has not provided a domicile for service in Switzerland despite being instructed to do so by the court.
>
> 2. Service is deemed accomplished on the day of publication.[3]

The critical point is that whether Mr. Megas's whereabouts were "unknown and cannot be ascertained despite making reasonable inquiries," and whether personal service "is impossible or would lead to exceptional inconvenience," were questions for the Swiss authorities to decide. The Federal Office of Justice guidance says that cantonal courts "prefer to investigate the matter" when requests for service by publication are made. International Judicial Assistance in Civil Matters, *supra* note 2, at 18.

---

[2] International Judicial Assistance in Civil Matters, at 18, *available at* https://www.rhf.admin.ch/rhf/fr/home/zivilrecht/wegleitungen.html.

[3] *Available at* https://www.fedlex.admin.ch/eli/cc/2010/262/en#art_141.

This is far from the first time that U.S. enforcement authorities have found the peculiarities of Swiss law frustrating, nor is it likely to be the last time. The SEC understandably wants to invent a U.S.-law override mechanism when it believes that foreign authorities are not being as helpful or as hard-nosed as the Commission would hope. But that is not the plan of the Convention. And it bears emphasis that the same features of the Convention's structure protect U.S. citizens from arbitrary decisions by distant foreign courts that may find compliance with U.S. law similarly inconvenient.

II. **THE HAGUE CONVENTION IS AN "INTERNATIONAL AGREEMENT" THAT PROHIBITS SERVICE BY EMAIL AND DEFAULT JUDGMENT IN THESE CIRCUMSTANCES**

The SEC declines this Court's request for briefing on whether the Hague Convention permits email service on a Swiss defendant, preferring instead to rest entirely on its threshold contention that the Convention does not apply. We do not agree that this Court can simply ignore "the active judicial debate regarding whether the Convention prohibits email service when it does apply." Appellee's Br. at 19. The Hague Convention *does* apply, and its plain terms and structure indicate that both service by email and default judgment were unavailable here.

A. **There Was No Valid Service Under The Hague Convention**

The Hague Convention does not permit email service in these circumstances for at least three reasons. *See Amicus* Suppl. Br. at 29–36.

First, Switzerland's objections to each of the Convention's alternative service methods mean that the Swiss Central Authority is solely responsible for executing all international requests for service of process. The simple fact that this email was sent by the SEC and not the Central Authority makes it invalid under the Convention.

Second, although Article 19 and Article 15(1) envision service by other methods permitted by the receiving State's domestic law, Swiss law categorically bars private litigants, such as the SEC, from effecting service by *any* means. In fact, Article 271 of the Swiss Criminal Code makes it a crime to "carr[y] out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official."[4] And even for Swiss authorities, email service is permitted only with the party's consent. *Amicus* Suppl. Br. at 30 (citing Article 139 of the Swiss Civil Procedure Code).

Third, there is a deep and entrenched split among the district courts over whether email service on a foreign party under Rule 4(f)(3) violates the Hague Convention. As our Supplemental Brief explained (at 29–36), the better reasoned authority recognizes that a signatory State's Article 10 objection to service by "postal channels" encompasses purported private service by email. *See, e.g., Agha v. Jacobs*,

---

[4] SR 311.0, art. 271 (1951); *see* International Judicial Assistance in Civil Matters, *supra* note 2, at 2 ("[Article 271] strikes against acts that violate Swiss territorial sovereignty and which as a consequence cannot be carried out without the permission of the Swiss authorities.").

2008 WL 2051061, at *2 (N.D. Cal. May 13, 2008); *Elobied v. Baylock*, 299 F.R.D. 105, 106–07 (E.D. Pa. 2014) (declining to authorize email service because Switzerland has expressly objected to Article 10). Indeed, the Supreme Court's decisions in *Schlunk* and *Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017), strongly indicate that the Convention prohibits all service methods that are not authorized by its terms. *See, e.g.*, *Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equip. Co.*, 494 F. Supp. 3d 404, 416–17 (N.D. Tex. 2020); *see Amicus* Suppl. Br. at 33–34.

The SEC conspicuously declines to offer any contrary argument.

**B.    Article 15 Precluded A Default Judgment**

The Hague Convention also barred the district court from entering a default judgment in these circumstances. Article 15(1) does not apply because neither the Convention nor Swiss law authorized the SEC's attempted service by email. The only question is whether default judgment was authorized under Article 15(2).

As we previously explained (*see Amicus* Suppl. Br. at 38–39), the Swiss Central Authority participated in the SEC's attempts to serve Mr. Megas in Switzerland. It sent the Commission multiple letters explaining its efforts to effect service. *See* SA84, JA141-42. And when the Swiss Central Authority ceased its efforts to serve Mr. Megas at his address in Verbier, it sent the SEC a formal letter returning its service request as unexecuted. JA127. Those communications,

individually or collectively, count as "certificate[s] of any kind" for purposes of Article 15(2). Article 6 makes explicit that a confirmation that service *was not* achieved counts as a "certificate." And if there were any doubt on that question, this record would not support a finding that the SEC made "every reasonable effort" to obtain a certificate without success. Again, the SEC has no response.

## III. THE DISTRICT COURT ERRED OR ABUSED ITS DISCRETION IN DECLINING TO EVALUATE THE SEC'S COMPLIANCE WITH RULES (4)(F)(1) AND (F)(2) BEFORE RESORTING TO (F)(3)

Even if Mr. Megas's address was "not known" and the Convention did not apply, the district court erred or abused its discretion by authorizing email service under Rule 4(f)(3) without fully considering whether the SEC had exhausted options for service under Rules 4(f)(1) and 4(f)(2). *Amicus*'s Supplemental Brief explained (at 40–46) why Rule 4(f) is best understood to create a hierarchy among its three subsections.

The SEC asserts that this Court need not address the interaction between Rule 4(f)'s three subsections because "neither the court nor the Commission went straight to Rule 4(f)(3)." Appellee's Br. at 22. It is true that the SEC first attempted service via the Hague Convention, but the district court made no finding that the Commission reasonably exhausted that possibility and this record would not support such a finding. Nor did the SEC's attempts to serve Mr. Megas by mail in the United Kingdom fairly exhaust the options for service consistent with foreign law under

13

Rule 4(f)(2). *See* Fed. R. Civ. P. 4(f)(2) (allowing federal district courts to authorize service via methods "prescribed by the foreign country's law for service in that country" if "there is no internationally agreed means"). The SEC's contention that those U.K. addresses were residential in nature is implausible. Each corresponded to a company, one of which had been dissolved. JA128-29. There was little indication that the addresses were anything but the locations of incorporated entities of which Mr. Megas was a current or former director. *Id.*; JA32.

There is, however, every reason to believe that the SEC had additional options for serving Mr. Megas consistent with Swiss law, in Switzerland. The Swiss court's August 23, 2021 letter to the SEC makes clear that it sent the Commission a memorandum outlining those options. JA141-42. The SEC makes no effort to explain why it did not follow up on them. The district court erred or, at least, abused its discretion by leaping to Rule 4(f)(3) without inquiring into what options existed for service consistent with Swiss law. The Advisory Committee Notes and basic principles of international comity favor a requirement that district courts at least *consider* whether it is possible and preferable to serve a foreign defendant in a manner consistent with the law of his own country. *See Amicus* Suppl. Br. at 42–44.

The Commission cites the Ninth Circuit's decision in *Rio Properties, Inc. v. Rio International Interlink* for the proposition that "court-directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2)."

14

284 F.3d 1007, 1015 (9th Cir. 2002); Appellee's Br. at 22–23. But despite the influence it has had, *Rio Properties* is not persuasive. And much of the later case law—including the circuit-level cases on which the SEC relies—simply follows *Rio Properties* without significant independent analysis. *See* Appellee's Br. at 24. For example, the Fifth Circuit's unpublished decision in *Viahart, L.L.C. v. GangPeng* devoted one conclusory sentence to the interaction between subsection (f)(1) and subsection (f)(3). 2022 WL 445161, at *3 (5th Cir. Feb. 14, 2022) (citing *Rio Properties*). The Commission's other cases are no different. *See Enovative Techs., LLC v. Leor*, 622 F. App'x 212, 214 (4th Cir. 2015) (citing *Rio Properties*); *AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 429 (1st Cir. 2015) (same).

The only meaningful exception is the Federal Circuit's opinion in *Nuance Communications, Inc. v. Abbyy Software House*, which concluded that "'Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections.'" 626 F.3d 1222, 1239 (Fed. Cir. 2010) (quoting *Rio Properties*, 284 F.3d at 1015). But the Federal Circuit then clarified that the "Advisory Committee Note to Rule 4 explains that Rule 4(f)(3) is particularly appropriate where a signatory to the Hague Service Convention has 'refused to cooperate for substantive reasons.'" *Id.* (quoting Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments)). The Note, the court further explained, suggests "that service under 4(f)(3) might be justified

when the foreign country's central authority 'refuses to serve a complaint seeking punitive damages or to enforce the antitrust laws of the United States.'" *Id.*

Exactly. Rule 4(f)(3) should be reserved, at least presumptively, for situations in which the Hague Convention applies, but the foreign State has been unresponsive. *See Amicus* Suppl. Br. at 42–44; Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments) ("[W]hen the signatory state was dilatory or refused to cooperate for substantive reasons . . . resort may be had *to the provision set forth in subdivision (f)(3).*" (emphasis added)). Reading Rule 4(f)(3) in a way that effectively nullifies Rule 4(f)(2)'s detailed requirements would violate basic canons of construction. *See Travers v. Fed. Express Corp.*, 8 F.4th 198, 208 (3d Cir. 2021) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976))). By contrast, recognizing that Rule 4(f)(3) implements Article 15(2) of the Convention gives it genuinely distinct and independent scope. It applies "when a foreign country's Central Authority fails to effect service within the six-month period provided by the Hague Convention or refuses to serve a complaint based on its own public policy or substantive law limitations." *C & F Sys., LLC v. Limpimax, S.A.*, 2010 WL 65200, at \*2 (W.D. Mich. Jan. 6, 2010) (internal citation omitted); *see also* Fed. R. Civ. P. 4 (advisory committee notes to the 1993 amendments) (explaining that Rule 4(f)(3) may be

invoked upon "the failure of the foreign country's Central Authority to effect service within the six-month period provided by the Convention").

Notwithstanding its reference to *Nuance Communications*, the SEC insists that courts have rejected reliance on the Advisory Committee notes. But the two district court opinions that the SEC cites provide only weak support for its position. In *Phoenix Process Equipment Co. v. Capital Equipment & Trading Corp.*, the court authorized substituted service on a Russian defendant under Rule 4(f)(3) even though there had been no attempt to comply with the Hague Convention. 250 F. Supp. 3d 296, 306 (W.D. Ky. 2017) ("[N]o such requirement is . . . even hinted at in the advisory committee notes." (quoting *Rio Properties*, 284 F.3d at 1015)). But its resort to Rule (4)(f)(3) had less to do with whether there is a hierarchy or preference in Rule 4(f) than with the fact that the Russian Federation simply declines to serve documents directed to its Central Authority. *Id.* at 305–07. Again, that is the *exact* situation for which Rule 4(f)(3) was designed. *See Amicus* Suppl. Br. at 43–44. The defendant in *Forum Financial Group, LLC v. President & Fellows of Harvard College* also was living in Russia, and the court correctly noted that, at the time, "Russia [was] not a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial [D]ocuments." 199 F.R.D. 22, 23 n.1 (D. Me. 2001).

We also explained (*see Amicus* Suppl. Br. at 44–45) that even if the Rule is not read to express a strict hierarchy, the district court's discretionary decision to

authorize service under Rule 4(f)(3) ought to be guided by principles of international comity. Those principles will generally prefer Rule 4(f)(2) to Rule 4(f)(3). A district court abuses its discretion when, as here, it authorizes use of a service method that will violate the law of a friendly foreign State without even considering whether there are feasible options for service that pose no such affront to international norms. The SEC, again, conspicuously has no response.

## IV. THE MANNER IN WHICH THE SEC SERVED MR. MEGAS DID NOT SATISFY DUE PROCESS

### A. Attempting To Serve Mr. Megas Via His Hotmail Account Was Not Reasonably Calculated To Notify Him Of The Suit

The district court violated due process when it authorized the SEC to direct service to a little-used and possibly defunct email address rather than to the email address that the SEC knew Mr. Megas regularly used.

The SEC argues that service methods need only be "reasonably calculated" to provide notice and that it had no due process obligation to "use the means *best* calculated" to effect service. Appellee's Br. at 24–25 (quoting *Stateside Machinery Co. v. Alperin*, 591 F.2d 234, 241–42 (3d Cir. 1979) (emphasis added), *superseded on other grounds by statute*, *Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 18 (3d Cir. 1985)). But the Supreme Court was clear in *Mullane* that when no method "reasonably certain" to provide notice is available "the form chosen [must] not [be] substantially less likely to bring home notice than other of the feasible and customary

substitutes." *Mullane*, 339 U.S. at 315. After all, the "means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.*

The cases the SEC cites hold that in-person service is not required when another customary method that is reasonably certain to provide notice (generally, certified mail at the defendant's address) has been employed. In *Stateside Machinery Co. v. Alperin*, for example, this Court concluded that service by certified mail at the defendant's residence was a "highly reliable" means "reasonably certain to notify" the defendant, and that the plaintiff was not *also* required to notify the defendant's former attorney. 591 F.2d at 241–42; *see also, e.g.*, *Krecioch v. United States*, 221 F.3d 976, 981 (7th Cir. 2000) (service by mail at the defendant's residence); *Matter of Park Nursing Ctr., Inc.*, 766 F.2d 261, 264 (6th Cir. 1985) (same). None of these cases genuinely support the proposition that a plaintiff can pick a *non-traditional* service method that is substantially less likely to bring home actual notice than a readily available and no more burdensome alternative.

The SEC acknowledges that it was unaware of any email sent from the Hotmail account since October 30, 2018, nearly two years before it attempted service at that address. JA85; SA80. It claims that "[e]vidence at the time of service, as well as during the district court's hearings, confirmed Megas's active Hotmail account." Appellee's Br. at 25. But the only evidence the Commission had that the account

remained active was an RPost confirmation four months previously that an email "was delivered successfully" to that account. JA32; *see* Appellee's Br. at 6. The mere fact that an email was *delivered* to an account once associated with Mr. Megas does not mean that he was actively using that account or that he (or anyone else) ever actually *received* that email. Indeed, the SEC's affidavits explain that RPost is capable of generating both proof of delivery and a receipt when an email is read— but tellingly state that only delivery was confirmed. *See* SA39. And the fact that the SEC received an auto-reply message to its service email that it did not receive four months previously suggests, at most, that someone accessed the account in that interval and wanted to warn other users that it was unmonitored.

The SEC's argument that "[e]vidence . . . during the district court's hearings, confirmed Megas's active Hotmail account" is irrelevant. Appellee's Br. at 25. In assessing whether service of process was "reasonably calculated" to provide notice of the suit, courts examine "the totality of the circumstances as they were known to [the] plaintiff at the time of service." *See Linh Thi Minh Tran v. Clear Recon Corp.*, 2017 WL 626361, at *1 (D. Or. Feb. 15, 2017) (citation omitted).

**B.    Actual Notice Does Not Defeat Mr. Megas's Due Process Claim**

The SEC further argues that Mr. Megas cannot establish a due process violation because he had actual notice of this litigation one year prior to the entry of the default judgment. Appellee's Br. at 28. But Mr. Megas did not know the details

or nature of this litigation. When questioned by Commission counsel, he explained only that he first "heard that there was a case made" in "July/August . . . of 2020" after "[s]omeone else told [him]." SA101-02.

The Supreme Court's decision in *United Student Aid Funds, Inc v. Espinosa*, 559 U.S. 260 (2010), on which the Commission relies, is easily distinguishable. The respondent in *Espinosa* filed a Chapter 13 bankruptcy plan to repay only the principal on his student loan debt with the remainder—the accrued interest—subject to discharge. The clerk of the Bankruptcy Court mailed notice and a copy of Espinosa's plan to United Student Aid Funds ("United"), his student loan servicer. On its face, the plan contained clear warnings that United's rights might be impaired by the plan. 559 U.S. at 265 ("In boldface type immediately below the caption, the plan stated: "WARNING IF YOU ARE A CREDITOR YOUR RIGHTS MAY BE IMPAIRED BY THIS PLAN.""). United received the notice and filed a proof of claim in response, but it did not otherwise object to Espinosa's proposed plan for discharging his student loan interest. Only later did United invoke Rule 60(b)(4) seeking to set aside the Bankruptcy Court's order confirming the plan, arguing that its due process rights had been violated because Espinosa failed to serve the company with a summons and complaint as required by the Federal Rules of Bankruptcy Procedure. The Supreme Court held that Espinosa did not violate United's due process rights "*on these facts*" by failing to serve it with a summons

and complaint, because the company had actual notice "of the filing and contents of Espinosa's plan." *Id.* at 272 (emphasis added).

The unpublished decisions of this Court addressing bankruptcy plans and government tax sales cited at page 27 of Appellee's Brief similarly involved much more specific notice about the litigation, its nature, and its potential consequences than what Mr. Megas received here. A holding that generalized awareness of litigation always defeats a due process challenge under Rule 60(b)(4), even when that litigation is taking place halfway around the world, would substantially exceed anything the Supreme Court or this Court have held previously, and would not comport with basic norms of fairness.[5] When interpreting Rule 4 in the context of international service of process the case law consistently emphasizes the importance of proper service notwithstanding actual notice. *See Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 492 (3d Cir. 1993) ("Although notice underpins Federal Rule of Civil Procedure 4 concerning service, notice cannot by itself validate an otherwise defective service."); *Mid-Continent Wood Prods., Inc. v. Harris*, 936 F.2d 297, 301 (7th Cir. 1991) (same).

---

[5] The SEC says that "throughout its unanimous decision, the [*Espinosa*] Court relied on a leading civil procedure treatise, which states that a 'failure to comply with statutory or procedural requirements ordinarily will not constitute a denial of due process for purposes of Rule 60(b)(4) if the party seeking relief received actual notice of the proceedings and had a full and fair opportunity to litigate the merits.'" Appellee's Br. at 27 (quoting 12 Moore's Federal Practice § 60.44[4] (3d ed. 2007)). To be clear, those words appear nowhere in the Supreme Court's opinion.

**V. THE DISTRICT COURT ERRED OR ABUSED ITS DISCRETION WHEN IT REFUSED TO SET ASIDE THE DEFAULT JUDGMENT AND ALLOW MR. MEGAS TO DEFEND THIS CASE ON THE MERITS**

At a minimum, the district court erred or abused its discretion by refusing to set aside its default judgment when Mr. Megas appeared, within a week of the entry of that judgment, to contest this case on the merits.

That decision was clearly motivated by irritation that Mr. Megas had not appeared voluntarily in this litigation despite general notice that it was taking place. The district court criticized him for "sleep[ing] on his rights," JA43, and "willfully avoid[ing] timely action in this matter," JA39. But Mr. Megas is an elderly resident of Switzerland with few ties to the United States. It is hardly surprising or blameworthy that he was reluctant to voluntarily surrender himself to a complex and burdensome civil enforcement action at the behest of American financial regulators located half a world away.

Mr. Megas had the "right to insist on service pursuant to the Hague Convention." *Sheets v. Yamaha Motors Corp.*, 891 F.2d 533, 536 (5th Cir. 1990). He was under no obligation to aid the SEC in its efforts to serve him. Mr. Megas also has advanced a serious argument that the purported email service here was invalid under the Convention, and that entry of a default judgment in these circumstances was inconsistent with Article 15. It was not unreasonable for him to expect that the U.S. courts would follow the Convention, and that he would not need to appear until

23

he had been properly served. If Mr. Megas had simply accepted service or appeared voluntarily in this case without reservations, he would have waived objections to service. Perhaps a special appearance would have been possible, but Mr. Megas is not familiar with U.S. law. Waiting to challenge a possible, but entirely uncertain, default judgment was a facially reasonable alternative. And once that default judgment was entered, Mr. Megas appeared *pro se* to challenge it before a week had gone by.

If Mr. Megas had consulted the governing case law, he would have discovered this Court's "overriding preference" that matters be litigated on the merits rather than resolved by default. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1188 (3d Cir. 1984) (Garth, J., concurring). This Court's cases make clear that any doubts "should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits." *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir. 1951); *see United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984) ("[T]his [C]ourt does not favor entry of defaults or default judgments."). The SEC does not acknowledge this body of Third Circuit precedent.

This Court's preference for adjudication on the merits should carry even more weight in a case, like this one, where the defendant responded only days after the district court's entry of the default judgment. In *Emcasco Insurance Co. v. Sambrick*, this Court held that the district court abused its discretion in refusing to set aside a

24

default judgment in part because the defendant's motion was filed only two weeks after the judgment was entered. 834 F.2d 71, 74 (3d Cir. 1987). The plaintiff in *Emcasco* did not argue that it had suffered prejudice "because its ability to pursue the claim ha[d] been hindered or that any relevant evidence ha[d] been lost." *Id.* The same is true here. "[T]he SEC has 'not asserted loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment to support a finding of prejudice.'" JA38 (quoting *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 657 (3d Cir. 1982)). And in any event, "[d]elay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice sufficient to prevent the opening [of] a default judgment entered at an early stage of the proceeding." *Feliciano*, 691 F.2d at 656–67.

Even if this Court ultimately disagrees with Mr. Megas's understanding of the Convention, his position is far from frivolous. A litigant with a reasonable belief that international service has not been effected, and that default judgment would violate treaty commitments of the United States, should not be punished for proceeding as he did here. Particularly in light of how promptly Mr. Megas appeared after entry of judgment, and the lack of prejudice to the SEC if that default judgment is set aside, JA38, this Court should follow its long-standing practice and allow Mr. Megas to defend this case on the merits.

**CONCLUSION**

The district court's order denying Mr. Megas's motion to vacate the default

judgment should be reversed, and the case remanded for litigation on the merits.

Respectfully submitted,

*/s/ J. Scott Ballenger*

J. Scott Ballenger
Ben Buell (Third Year Law Student)
Jon Duval (Third Year Law Student)

UNIVERSITY OF VIRGINIA
SCHOOL OF LAW
Appellate Litigation Clinic
580 Massie Road
Charlottesville, VA 22903
(434) 924-7582
sballenger@law.virginia.edu

*Amicus Curiae Supporting Appellant*

# COMBINED CERTIFICATES

## I.  Statement of Bar Membership

Pursuant to Local Appellate Rule 46.1(e), J. Scott Ballenger, certifies that he is counsel of record and is a member of the bar of the United States Court of Appeals for the Third Circuit.

## II.  Statement of Compliance with Frap 32(a)(7)(b)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,396 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman.

## III.  Statement Of Service and ECF Filing

I, J. Scott Ballenger, certify that on February 16, 2024, I electronically filed the foregoing Opening Brief on Behalf of Appellant by using the CM/ECF system with the Clerk of the Court for the United States Court of Appeals for the Third Circuit.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

I further certify, I sent seven (7) copies of the Reply Brief of Appointed *Amicus Curiae* Supporting Appellant, via FedEx, to the Clerk of the Court for the United States Court of Appeals for the Third Circuit.

**IV.     Statement of Identical Compliance Briefs**

I, J. Scott Ballenger, hereby certify that the text of the electronically filed brief is identical to the text of the original copies that were dispatched on February 16, 2024, by FedEx delivery, to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

**V.     Statement of Virus Check**

I, J. Scott Ballenger, hereby certify that on February 16, 2024, I caused a virus check to be performed on the electronically filed copy of the forgoing Reply Brief of Appointed Amicus Curiae Supporting Appellant using the following virus software: Vipre Virus Protection, EndpointSecurity, version 11.0.7633. No virus was detected.

*/s/ J. Scott Ballenger*
J. Scott Ballenger
*Amicus Curiae Supporting Appellant*